UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

STEVEN DALE MOUNCE

VERSUS

JOHN DOE 1, ET AL.

CIVIL ACTION NO.:   12-0669

SECTION:   "I"

MAGISTRATE:   02

## AFFIDAVIT OF DR. R. DEMAREE INGLESE

STATE OF LOUISIANA

PARISH OF ST. TAMMANY

      **BEFORE ME**, Notary Public, came and appeared:

Dr. R. Demaree Inglese

a person of the full age of legal majority, who after being duly sworn did depose and state:

1.     I earned a M.D. degree from the University of Pennsylvania School of Medicine, and I am licensed to practice medicine in the State of Louisiana.

2.     I am one of the named defendants in the above-captioned lawsuit.

3.     I have been qualified on numerous occasions as an expert in both state and federal courts in Louisiana in the areas of internal medicine, correctional health care, infection control, as well as the treatment for and management of specific diseases such as HIV, Hepatitis C, and Tuberculosis that tend to present much more commonly within an institutional setting than in the public at large.

4.      I am a duly-sworn deputy sheriff of Rodney J. "Jack" Strain, Jr., Sheriff of St. Tammany

Parish ("Sheriff Strain"), and I currently hold the rank of Captain with the St. Tammany Parish

Sheriff's Office.

5.      I have served as the Medical Director of the St. Tammany Parish Jail ("STPJ"), which is

operated by Sheriff Strain, from May 2004 up to today.

6.      I also served as Medical Director of Orleans Parish Prison, one of the largest municipal

jails in the country, from November 2000 to July 2006.

7.      In my capacity as STPJ Medical Director, I am directly responsible for the management

and operations of the STPJ's Medical Department, which includes the provision of dental

services to inmates.  I personally hire all staff (which presently consists of approximately 30

individuals), develop and implement all policies and procedures, and personally respond to all

complaints or grievances submitted by inmates.

8.      In addition to these administrative duties, I also function as a staff physician and treat

inmate patients on a regular basis.

9.      I also regularly serve as an expert consultant in the field of correctional health care.  In

that capacity, I have consulted and reviewed medical operations for a total of 16 parish jails

across the State of Louisiana.

10.     As a result of the above, I know the facts and conclusions set forth in this affidavit of my

own personal knowledge, experience, and expertise.

11.     Among the physicians and other health-care professional whose practices include

providing services at correctional facilities, the field of correctional health care is a well-

recognized and well-defined 'specialty' within the general field of health care.

12.     A 'jail' such as STPJ is defined within the field of correctional health care as a local detention facility, operated by a parish or county, where detainees are held for *relatively short periods of time* while they await trial, serve out relatively short sentences, or approach the end of longer sentences.

13.     Thus, for purposes of the provision of health-care services, jails are viewed differently and held to a different standard than the facilities operated by the Louisiana Department of Corrections, which include medium-term facilities like Elyan Hunt Correctional Center and Rayburn Correctional Center, and long-term facilities such as the Louisiana State Penitentiary at Angola, LA.

14.     STPJ does have a written policy detailing the dental care provided to inmates and that policy was in place during Mr. Mounce's incarceration there.  The policy was developed by me, in conjunction with our senior-serving dentist, Dr. Gary Bencsek.  It is based upon various national standards and guidelines that are well-known to all professionals involved in the management of correctional-facility heath care, as well as my own professional experience and expertise.[1]

15.     At no time during my tenure as STPJ Medical Director has it been the policy, either written or unwritten in nature, to offer extraction as the only treatment option for tooth decay.  In fact, the written policy expressly mandates that "[d]ental services at the jail will NOT be limited to tooth extractions."

16.     The specific dental procedures in addition to extractions that are performed on a regular basis at STPJ include but are not necessarily limited to:

       a.     Provision of dental wax, mouth rinses, and pain medication;

---

[1]     A photocopy of that policy is attached to the Defendants' Motion for Summary Judgment as Exhibit "L" and it is incorporated and adopted herein by this reference.

    b.      Oral Hygeine;

    c.      Treatment of periodontal disease;

    d.      Recontouring and smoothing of sharp teeth;

    e.      Limited occlusal equilibrations;

    f.      Enameloplasty of teeth;

    g.      Tooth desensitization;

    h.      Sedative restorations (temporary fillings);

    i.      Wisdom tooth extractions;

    j.      Removal of arch bars and orthodontic braces;

    k.      Removal and/or recementing of crowns; and

    l.      Adjustments of partials and denture.

17.    In addition, inmates whose condition exceeds on-site capabilities and/or requires oral surgery are sent to an off-site facility, either the LSU interim hospital system or a local oral surgeon.

18.    The average length of stay for inmates at STPJ who do not immediately bond out is approximately *8 weeks*, although it is impossible to anticipate as to any particular inmate.

19.    During the course of any calendar year, as many as *10,000 separate inmates* pass through STPJ, every one of those inmates has at least some degree of interaction with the Medical Department.

20.    The function of the STPJ Medical Department is to provide basic health care (medical, dental, and mental health care) to this transient inmate population until detainees are released from custody or are sentenced and thereafter transferred to a longer-term correctional facility, as referenced above.  A jail is expected to attend to any medical (including dental) emergencies that arise as to an inmate and to continue care for an inmate's chronic medical conditions.  Jail health staff are also expected to treat acute medical problems that occur, either in-house if minor in nature or by outside referral if more significant.

21.     It therefore is neither practical nor expedient for jails to provide comprehensive medical care, including the full spectrum of preventive medical services, given the huge flux of inmates through the facility and the typically short lengths of stay.

22.     Jails simply are not designed, intended, or funded to serve the role of comprehensive health care facilities.  Instead, the role of a jail Medical Department is to keep an inmate safe and healthy until release or transfer.  Elective procedures are often deferred until an inmate's release/transfer, and such deferrals do not in and of themselves constitute a breach in the standard of care.  At other times, temporizing measures are utilized until the inmate returns to home or is sentenced and transferred to a longer-term facility better suited to provide more definitive care.

23.     It is certainly _not_ the standard of dental care for a jail (in Louisiana or across the nation) to provide routine teeth cleaning upon inmate request or to offer major restorative care like root canals and crowns, although some (including STPJ) may _choose_ to do so in certain limited circumstances.

24.     None of the 16 Louisiana jails that I have consulted for provide routine teeth cleaning for inmates, root canals, or crowns.

25.     Based upon my own experience and expertise, the expert report tendered in this matter by Kathryn Sturm, D.D.S. clearly demonstrates Dr. Sturm's utter lack of particularized knowledge of or expertise in the field of correctional-facility dental care.  Specifically:

- Dr. Sturm's suggestion that the jail should offer "routine cleanings for inmates who desire it" (page 10) is unrealistic and, as stated above, far outside the standard of care applicable to correctional dentistry.  As mentioned, the vast majority of inmates are housed in a jail for a relatively short period of time.  While teeth cleaning is indeed

important, deferring a cleaning for several months should have little impact on an individual's long term oral health. If an inmate has been getting yearly cleanings prior to incarceration, delaying their cleaning by several months should have little adverse consequence. Conversely, if an individual has not sought dental care in years, or even decades, a delay of a few more months should prove inconsequential.

- Dr. Sturm objects to the STPJ dentists' use of temporary fillings (pages 7 & 8). But there is nothing inappropriate or outside the standard of care about the use of temporary fillings at STPJ. In fact, if Dr. Sturm were more familiar with jail dentistry, she would realize that temporary fillings are widely utilized in jail settings. Jail dental staff realize that the inmate population is largely short term, so temporary fillings are used to bridge the gap until an inmate is released from a jail's custody and can seek a more permanent solution.

- Dr. Sturm's comments regarding the provision of toothbrushes and dental floss to inmates (pages 10 & 11) are either incorrect, uninformed, or both. The STPJ *does* provide tooth brushes and toothpaste to inmates. Every inmate is provided with these items as a matter of standard operating procedure. The brushes are short "finger brushes"; however, this is quite necessary as the longer brushes commonly sold in the outside world are too dangerous for inmate distribution. Standard toothbrushes can easily be filed into shanks, and the correctional literature is rife with examples of such toothbrush-shanks. As for dental floss, it is common practice in jails across the U.S. to restrict to dental floss from the inmate population. Dental floss presents a number of security concerns as it may be braided and fashioned into rope; twisted and used as a garrote; or moistened and used to "saw" through cell bars.

26.     The STPJ Medical Department has never statistically charted the various dental treatments provided to patients.  As a result, I have no "hard" data on the percentage of extractions versus filings versus other types of dental procedures performed at STPJ.

27.     Based on my review of STPJ dental records, my discussions with Dr. Bencsek and Dr. Leggio, and other anecdotal evidence, I estimate that the percentage of extractions performed is in the range of 80 to 90 percent of the dental care provided at STPJ, although many of the inmates who have a tooth extracted also receive other types of treatment.

28.     This percentage of extractions is in line with my professional experience at other correctional facilities.

29.     Although Mr. Mounce refused the option of extraction offered to him by both Dr. Benscek and Dr. Leggio, he did in fact receive other treatment, including tooth desensitization and the provision of dental wax, mouth rinse, and pain medications.

30.     There are a number of factors specific to correctional facilities in general and to jails in particular that result in this relatively high proportion of extractions:

- Inmates are much more likely to be from the lower end of the socio-economic scale and therefore do not have nearly the same access to dental care or to education about dental care as the general public.  Thus, their level of dental heath tends to be rather poor, meaning more decay and more need for extractions.

- A high percentage of inmates are regular users of illegal drugs, many of which wreak havoc on one's dental health and necessitates more surgical interventions.

- STPJ charges a $10 co-payment for every dental visit, pursuant to the authority of parish ordinance (and state statute for DOC offenders).  Given the limited financial resources of almost all inmates, most of them delay dental care until the pain become intolerable,

which usually correlates to an advanced level of tooth decay and thus a lower percentage of salvageable teeth.

- A large number of inmates struggle with issues of impulse control and are much more likely to opt for tooth extraction as the "easiest" and "simplest" way of dealing with their tooth problems without consideration of the long-term consequences.

31.    There are also several factors that explain the somewhat higher rate of extractions at a jail like STPJ as opposed to a prison like Rayburn Correctional Center:

- By the time inmates reach prison, most have spent many months in a local jail.  During that time, most inmates with "bad" teeth have had the opportunity to see a dentist in that facility, and the worst of their teeth have already been extracted.  Consequently, prison dentists typically see inmates with fewer severely decayed teeth; hence, you would expect a lower extraction rate at prison.

- As mentioned above, jails tend to incarcerate individuals for relatively short periods of time.  By contrast, offenders typically stay in prison for many years or even decades.  As a result, prison dentists are in a situation to provide more in the way of "permanent" interventions, along with more emphasis on preventive dental services.  They are also much more able to offer the "wait-and-see" option than are jail dentists.

R. Demaree Inglese, M.D.

Sworn to and subscribed before me,
this 17th day of December, 2013.

_____
Notary Public
Printed Name:_____
La. Bar No._____

GARY L. HANES
ATTORNEY & NOTARY PUBLIC
STATE OF LOUISIANA
LA BAR ROLL # 14341
NOTARY ID # 46816
My Commission Expires at Death

- 8 -