UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

STEVEN DALE MOUNCE                          CIVIL ACTION

VERSUS                                      NO. 12-669

JOHN DOE ET AL.                             MAGISTRATE JUDGE
                                            JOSEPH C. WILKINSON, JR.

## ORDER AND REASONS ON MOTIONS

Plaintiff, Stephen Dale Mounce, is a prisoner currently incarcerated in the Rayburn
Correctional Center ("Rayburn").  He originally filed this complaint pro se and in forma
pauperis pursuant to 42 U.S.C. § 1983 and Louisiana state law against "John Doe 1,"
"John Doe 2" and "John Doe 3," whom plaintiff described as the St. Tammany Parish
Jail's medical director and two dentists who had treated him when he was incarcerated at
that jail.  Defendants, identifying themselves as medical director Richard D. Inglese,
M.D., Ronald S. Leggio, D.D.S., and Gary Benscek, D.D.S., moved to dismiss plaintiff's
complaint.  Record Doc. No. 21.  After the court appointed counsel to represent Mounce,
the court dismissed without prejudice defendants' motion to dismiss, and Mounce filed
an amended complaint naming St. Tammany Parish Sheriff Jack Strain, Jr., Warden Greg
Longino, Dr. Inglese, Dr. Bencsek and Dr. Ronald S. Leggio as defendants.

Plaintiff alleges that, while he was incarcerated at the St. Tammany Parish Jail from
February 2, 2011 to March 19, 2012, defendants had a policy of offering only extractions
of teeth and were deliberately indifferent to his serious dental needs, in violation of 42
U.S.C. § 1983.  He also asserts negligence claims under state law.  He seeks monetary

damages and "[a]ffirmative relief to ensure that the complained of violations do not recur."  Amended Complaint, Record Doc. No. 28 at p. 18.

Counsel for defendants answered the amended complaint on behalf of all named defendants, including Ronald S. Leggio, D.D.S.  Record Doc. No. 34.  Defendants then began referring to Michael L. Leggio, D.D.S., as a defendant in some, but not all, of their subsequent submissions to the court.  Defendants have sometimes referred to both names in the same filing (e.g., Record Doc. No. 40 at pp. 1, 8), and they even named Ronald S. Leggio, D.D.S., as both a defendant and a fact witness on their witness list, Record Doc. No. 59, although they explain in their memorandum in support of their pending motion in limine that "Dr. Ronald Leggio . . . is the father of the Dr. Leggio who is a defendant in this suit."  Record Doc. No. 64-1 at p. 2.

The stipulated facts and evidence submitted in conjunction with the pending cross-motions for summary judgment establish that Michael L. Leggio[1] and Dr. Benscek were the only dentists employed by the St. Tammany Parish Jail during the relevant time period.  None of the litigants has moved to amend the pleadings to substitute Michael L. Leggio for Ronald S. Leggio, but it is clear that Michael L. Leggio, not Ronald S. Leggio, is the proper defendant in this lawsuit.  Therefore, all references to "Dr. Leggio" in the remainder of this decision refer to Michael L. Leggio.

---

[1] Dr. Michael Leggio testified that he practices dentistry in a private practice with his father and sister.  Record Doc. No. 67-9 at p. 7.  The Leggio Dental Group's website states that Ronald Leggio is Michael Leggio's father.  http://www.realpages.com/sites/leggiodental (visited on May 1, 2014).

This matter was referred to a United States Magistrate Judge for all proceedings and entry of judgment in accordance with 28 U.S.C. § 636(c) upon written consent of all parties.  Record Doc. No. 24.

Defendants filed a motion for summary judgment, supported by Mounce's arrest record; his jail dental records; the transcript of this court's hearing conducted pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny on May 31, 2012,[2] at which Mounce testified under oath; excerpts from the depositions of Dr. Leggio and Dr. Bencsek; the affidavit of Dr. R. Demaree Inglese; the report and curriculum vitae of plaintiff's expert dentist, Kathryn Sturm, D.D.S.; portions of the St. Tammany Parish Jail Medical Policy and Procedure Manual; and the declaration under penalty of perjury of Dr. Thomas Sutherland, a dentist who treated plaintiff at Rayburn, where Mounce has been incarcerated since April 16, 2012.  Record Doc. No. 60.  Defendants argue that they never had, and plaintiff has no evidence to prove that they had, an extraction-only policy at the St. Tammany Parish Jail.  They argue that they are entitled to qualified immunity on plaintiff's claims of deliberate indifference to his serious dental needs.  They further contend that plaintiff's negligence claims should be dismissed either because Mounce must first bring any claim of dental malpractice before a medical review panel, pursuant

---

[2]The copy of the Spears hearing transcript filed with defendants' motion for summary judgment is incorrectly captioned United States v. Stephen Dale Mounce, Criminal Action No. 12-0669.  Record Doc. No. 60-5.  A copy with the correct civil action caption is in the record at Record Doc. No. 19.

to La. Rev. Stat. § 40:1299.41 et seq., but has not done so; or because the court lacks jurisdiction over his state law claims if it dismisses his federal claims.

Mounce filed a timely cross-motion for summary judgment with an incorporated memorandum in opposition to defendants' motion. He supports his submission with the complete deposition transcripts of Warden Longino and Drs. Inglese, Bencsek and Leggio; the declarations under penalty of perjury of plaintiff himself,[3] fellow inmate George Duffy, and Dr. Sutherland; the dental records of 16 other inmates who were incarcerated at the St. Tammany Parish Jail during the same time period as Mounce; a few of plaintiff's own dental and medical records that were not included in defendants' submissions; and an inmate complaint form by another inmate at the St. Tammany Parish Jail regarding his dental care, dated August 3, 2011. Record Doc. No. 67. Mounce argues that the undisputed facts establish that defendants had a customary policy of extracting restorable teeth; they disregarded his serious dental needs despite their actual knowledge of those needs; and their deliberate indifference was objectively unreasonable under clearly established Eighth Amendment law.

Defendants received leave to file a memorandum in reply to plaintiff's opposition to their motion for summary judgment and in opposition to Mounce's cross-motion for summary judgment. Record Doc. Nos. 72, 75, 78.

---

[3]Mounce originally filed an unsigned declaration, but received leave to file a signed declaration. Record Doc. Nos. 80, 81.

4

Defendants also filed a motion in limine to exclude the testimony and report of plaintiff's expert, Dr. Sturm.  Record Doc. No. 64.  Mounce filed a timely memorandum in opposition.   Record Doc. No. 66.   Defendants received leave to file a reply memorandum.  Record Doc. Nos. 73, 76, 77.

After oral argument on the pending motions, the court ordered the parties to confer and file a joint stipulation of those facts as to which they agree there is no genuine dispute for trial.  The court also continued without date the final pretrial conference and trial dates to permit a thorough consideration of the cross-motions for summary judgment and their voluminous supporting evidence.  Record Doc. No. 79.  The parties timely filed a joint stipulation of undisputed facts.  Record Doc. No. 82.

Having considered the complaint, as amended; the record; the stipulated facts; the submissions of the parties and the applicable law; and for the following reasons, IT IS ORDERED that defendants' motion in limine is GRANTED IN PART AND DENIED IN PART, as set forth below.  IT IS FURTHER ORDERED that defendant's motion for summary judgment is GRANTED and that plaintiff's motion for summary judgment is DENIED.  Judgment will be separately entered.

I.   DEFENDANTS' MOTION IN LIMINE

Defendants moved to exclude the report of plaintiff's expert witness, Kathryn Sturm, D.D.S., Record Doc. No. 64-3 (which is also in the record as an exhibit to defendants' motion for summary judgment, Record Doc. No. 60-12), and anticipated testimony on grounds that (1) her evidence will not assist the trier of fact to understand

5

the evidence or determine a fact in issue, as required by Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharm., 509 U.S. 579 (1993), and (2) her report exceeds the bounds of Federal Rule of Evidence 704 because it offers legal conclusions.  Defendants concede that Dr. Sturm is qualified as an expert in the field of general dentistry. However, they contend that she is not qualified by experience or specialized training, and has never been accepted by a court, as an expert in correctional dentistry, in which they assert that the standards of care are different than in general dentistry.  Defendants also argue that a conflict of interest exists between Dr. Sturm and Dr. Leggio that taints her testimony, but they have offered no evidence to support this speculative allegation.

Fed. R. Evid. 702 provides that a witness

who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 704(a), "opinion testimony otherwise admissible is not objectionable because it includes an ultimate issue to be decided by the trier of fact." C.P. Interests, Inc. v. Cal. Pools, Inc., 238 F.3d 690, 697 (5th Cir. 2001); accord Goodman v. Harris Cnty., 571 F.3d 388, 399 (5th Cir. 2009).

"In Daubert, the Supreme Court explained that Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant."

Johnson v. Arkema, Inc., 685 F.3d 452, 459 (5th Cir. 2012) (quotation and citation omitted).  "The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation." Johnson v. Big Lots Stores, Inc., No. 04-3201, 2008 WL 1930681, at *1 (E.D. La. Apr. 29, 2008) (Vance, J.) (citing Daubert, 509 U.S. at 590). Plaintiff, as the party offering the expert testimony, bears the burden of establishing its reliability and relevance by a preponderance of the evidence. Johnson, 685 F.3d at 459.

To qualify as an expert, the witness "must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier [of fact] in his search for truth." United States v. Hicks, 389 F.3d 514, 524 (5th Cir. 2004) (quotation omitted).  "As long as some reasonable indication of qualifications is adduced, the court may admit the evidence without abdicating its gate-keeping function. After that, qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity." Rushing v. Kan. City S. Ry., 185 F.3d 496, 507 (5th Cir. 1999), superseded in part by statute on other grounds as noted in Mathis v. Exxon Corp., 302 F.3d 448, 459 n.16 (5th Cir. 2002).

"The qualification standard for expert testimony is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." QBE Ins. Corp. v. Jorda Enters., Inc., No. 10-21107-CIV, 2012 WL 913248, at *3 (S.D. Fla. Mar. 16, 2012) (quotations omitted) (citing Rushing, 185 F.3d at 507; Clena Invs., Inc. v. XL Specialty Ins. Co., No. 10-62028, 2012 WL 266422, at *6 (S.D. Fla. Jan. 30, 2012); Vision I Homeowners Ass'n, Inc. v. Aspen

Specialty Ins. Co., 674 F. Supp. 2d 1321, 1324 (S.D. Fla. 2009); Johnson, 2008 WL 1930681, at *14).  "A witness qualified as an expert is not strictly confined to his area or practice, but may testify regarding related applications, rather 'a lack of specialization does not affect the admissibility of the opinion, but only its weight.'"  Cashman Equip. Corp. v. Rozel Operating Co., No. 08-363, 2012 WL 2519970, at * (M.D. La. June 28, 2012) (quoting Wright v. John Deere Co., 935 F.2d 1090, 1100 (10th Cir. 1991)) (citing Rushing, 185 F.3d at 507).

"'As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." Primrose Operating Co. v. Nat'l Am. Ins. Co., 382 F.3d 546, 562 (5th Cir. 2004) (quoting United States v. 14.38 Acres of Land, 80 F.3d 1074, 1077 (5th Cir. 1996)). As the Supreme Court noted in Daubert, "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"  Id. (quoting 14.38 Acres of Land, 80 F.3d at 1078) (internal quotations omitted)).

The district court has considerable discretion to admit or exclude expert testimony. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 138-39 (1997); Seatrax, Inc. v. Sonbeck Int'l, Inc., 200 F.3d 358, 371 (5th Cir. 2000).  This court's gate-keeping role when deciding the admissibility of such testimony is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the

same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Id. at 372 (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999)).

Whether the determined facts constitute a violation of a constitutional right is a question of law. Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency, 533 F.3d 258, 267 (5th Cir. 2008); Gates v. Cook, 376 F.3d 323, 333 (5th Cir. 2004). "Neither rule [702 nor 704(a)], however, permits expert witnesses to offer conclusions of law." C.P. Interests, Inc., 238 F.3d at 697 (citing Owen v. Kerr McGee Corp., 698 F.2d 236, 240 (5th Cir. 1983)).

"There is a difference between offering an opinion that may embrace the ultimate issue and offering a legal opinion that does nothing more than tell the trier of fact how to decide the ultimate issue. Opinions that are 'nothing more than legal arguments' are not admissible." Virginia Coll., LLC v. Martin, No. 3:11CV682, 2012 WL 6588700, at *1 (S.D. Miss. Dec. 17, 2012) (quoting Snap-Drape, Inc. v. Comm'r, 98 F.3d 194, 198 (5th Cir. 1996)) (citing BNY Mellon, N.A. v. Affordable Holdings, Inc., No. 1:09CV226-SA-JAD, 2011 WL 2746301, at *1 (N.D. Miss. July 12, 2011)).

Applying these standards to Dr. Sturm's report and anticipated trial testimony, defendants' motion in limine is granted in part and denied in part. I find that Dr. Sturm is qualified as an expert in general dentistry and that some, but not all, of her opinions are admissible. Dr. Sturm's merely speculative conclusions, which are unsupported by the

evidence, and her opinions regarding jail administration, which are beyond her expertise, are inadmissible.

As to Dr. Sturm's qualifications, defendants concede that her lack of prior qualification as an expert in any court does not render her testimony inadmissible, as "[t]here is a first time in court for every expert." United States v. Parra, 402 F.3d 752, 758 (7th Cir. 2005). Defendants have cited no authority for their contentions that correctional dentistry is a specialized field that requires Dr. Sturm to have specialized expertise to testify in this case, or that her testimony and report are entirely inadmissible because she is not an expert in that particular field, if such a field exists. Defendants' contentions about Dr. Sturm's qualifications to opine regarding the standards of dental care applicable in a parish jail essentially attack the weight, rather than the admissibility, of her opinions. Defendants can counter her opinions about the standard of care through cross-examination and the presentation of countervailing evidence, such as Dr. Inglese's opinions in his affidavit about the strength of her credentials and validity of her opinions. Exh. G to defendants' motion for summary judgment, Record Doc. No. 60-9 at ¶¶ 20-25. Thus, I find that Dr. Sturm is qualified by her knowledge, skill, experience, training and education to render opinions in the field of general dentistry.

Dr. Sturm's opinions regarding the dental practices and treatments that were performed at the St. Tammany Parish Jail are admissible because they are based on her knowledge and experience in general dentistry and on the evidence that she reviewed in this case, which included plaintiff's own records and 116 randomly selected inmate dental

records from the relevant time period.   See Al-Turki v. Robinson, No. 10-cv-02404-WJM-CBS, 2013 WL 603109, at *5 (D. Colo. Feb. 15, 2013) (quotation omitted) (In Section 1983 case, medical doctor need not be specialist to render medical opinions regarding plaintiff's urological problems, "offered from the perspective of a primary care physician, and no specialization-level expertise is required to support those opinions.").

However, I find that Dr. Sturm's report is inadmissible to the extent she opines about the more extensive care, such as permanent fillings and preventative care, that she believes the jail "should" provide to promote inmates' dental health.  These opinions regarding aspects of jail administration and public policy are beyond her expertise and are not informed by any cited standards or publications in the field of medical or dental care at correctional institutions.  Her opinions in this regard are excluded.

In addition, certain of Dr. Sturm's conclusions in her report are speculative and inadmissible because they are not based on the undisputed evidence or on any stated reliable, scientific methodology.   Her speculation includes statements such as the following (speculative words are underlined and the bracketed material is added):

> After several [unspecified] meetings [at unspecified times] with dentists where patients were offered extractions [for unknown and unspecified reasons, which may or may not have been appropriate based on the dentist's professional judgment], word likely spread through the inmate population that this was the only treatment available to them.  Once this reputation [based on unspecified and unknown incidents] had spread to many inmates, it would drastically alter the treatment options inmates would seek from the dentists.  I suspect [without any specific evidentiary basis] that the original mindset [which is undefined and of which Dr. Sturm has no personal knowledge] by the [unnamed] officials at [St. Tammany Parish Jail] and the subsequent communication of that mindset to inmates would likely create

11

a system whereby inmates <u>would generally</u> seek to have their teeth extracted and, even if asked to offer other treatments, the dentists <u>would often</u> offer extractions.

Dr. Sturm's report, Record Doc. Nos. 60-12 and 64-3 at pp. 3-4 n.2 (emphasis added).

Dr. Sturm also speculates, without any evidence or indicia of scientific process, that "the fact that a large number of patients are requesting extractions <u>may be</u> a sign that the inmates have an understanding that the only solution to their dental concerns that is available through the dentists at [St. Tammany Parish Jail] is extraction." <u>Id.</u> at pp. 6-7 (emphasis added). She does not discuss whether any inmates actually have such an understanding, the factual basis for such an understanding, whether such an understanding might be based on incorrect facts or assumptions, or any other possible reasons why a large number of jail inmates ask for extractions.

Dr. Sturm reviewed a randomly selected sample of 116 inmate dental records from the St. Tammany Parish Jail. She found that 91.4 percent of the records contained either an extraction, post-operative treatment for an extraction or a recommendation that extraction is the best course of treatment. The parties have stipulated that extractions of teeth constitute 80 to 90 percent of the dental care provided at the St. Tammany Parish Jail. Dr. Sturm acknowledges the undisputed fact that the inmate population in the St. Tammany Parish Jail generally has terrible dental health before arrival at the jail, <u>id.</u>, and she opines that extraction is an appropriate and valuable treatment in many instances. <u>Id.</u> at p. 6 n.7. She opines that a dentist's recommendations should be based on visual examination of the teeth, an x-ray and evaluation of the patient's reported symptoms, and

she admittedly did not have the benefit of either visual examination or x-rays.  She admits that she cannot evaluate whether any of the teeth described in the inmate records that she reviewed, including plaintiff's, were actually restorable or whether extraction was an inappropriate treatment in any particular case.  Id. at p. 7.

Nonetheless, Dr. Sturm speculates, without any evidence or explanation beyond the bare statistic, that it "seems highly unlikely that all of these teeth could only be treated by extractions."  Id. at pp. 5-6.  She does not discuss the methodology she used to make this inference or explain why it "seems highly unlikely" that a combination of the treating dentist's professional judgment, each inmate's dental health and symptoms, and the inmate's own preference led to the large percentage of extractions.

Based on the statistical evidence, on her opinion that "the only other treatment options provided at [St. Tammany Parish Jail] besides extractions are minor procedures that are not appropriate to treat all dental concerns," on Mounce's treatment records and grievances, and on the entirely conjectural sequence of inmate rumors and factually unsupported possibilities quoted above, Dr. Sturm concludes that "the sheer number of extractions and the fact that patients come in saying they want their teeth pulled suggest that the general policy in [St. Tammany Parish Jail] is that the dentists mostly pull teeth" and that "there is an expected and accepted policy of extractions at" the jail.  Id. at p. 5.

To the extent that this somewhat vague conclusion (expected by whom?  accepted by whom?) is intended to mean that defendants had an extractions-only policy, it is unsupported by the evidence or reliable scientific methodology.  Obviously, no procedure,

13

whether minor or not, is appropriate to treat <u>all</u> dental concerns.  Although Dr. Sturm characterizes the other treatment options offered and performed at the jail as minor, she concedes that such options were offered, which contradicts her opinion that defendants had an extractions-only policy.

Dr. Sturm's reasoning for her conclusion that the jail had an accepted policy of extractions, in addition to being based on a string of unsupported speculative possibilities and being contrary to the undisputed fact that the jail offered other dental treatments, fails to take into account the undisputed evidence from dentists experienced in prison dentistry that many inmates <u>seek</u> extraction as <u>their</u> preferred method of dealing with the pain of a tooth that already has advanced decay and Dr. Sturm's own statement that such a treatment is appropriate in individual cases in the exercise of professional judgment. Deposition of Gary Bencsek, D.D.S., Record Doc. No. 67-7 at p. 29; deposition of Richard D. Inglese, M.D., Record Doc. No. 67-6 at pp. 117-18 (pp. 109-10 of deposition transcript); declaration under penalty of perjury of Dr. Thomas Sutherland, Record Doc. No. 67-11 at ¶ 27.  "For a witness to stack inference upon inference and then state an opinion regarding the ultimate issue is even more likely to be unhelpful to the trier of fact." <u>Woods v. Lecureux</u>, 110 F.3d 1215, 1221 (6th Cir. 1997).

Further, Dr. Sturm notes that a temporary filling will fail after a "significantly shorter period of time than a permanent filling" and that "[t]he long-term result of not offering permanent fillings can be further deterioration of the tooth."  Dr. Sturm's report, Record Doc. Nos. 60-12 and 64-3 at p. 10.  Drs. Leggio and Bencsek agreed with these

statements in their respective deposition testimony.  Dr. Sturm then opines that "[t]his is clearly what happened at [the St. Tammany Parish Jail]," id., a statement of apparent cause and effect that is speculative and lacking in both evidentiary foundation and indicia of scientific reliability.  Her opinion fails to take into account the undisputed evidence that many inmates at the St. Tammany Parish Jail generally have poor dental health before arrival, that many present with teeth in advanced stages of decay and that the average length of incarceration for an inmate at the jail is not "long-term."  According to the undisputed testimony of Drs. Inglese and Bencsek, the average inmate stay is only four to eight months, a time period during which a temporary filling would not be expected to fail.  Dr. Inglese deposition, Record Doc. No. 67-6 at pp. 105-06, 111-12, 156-57 (pp. 99-100, 105-06, 148-49 of deposition transcript); Dr. Bencsek deposition, Record Doc. No. 67-7 at pp. 21-22.  Dr. Sturm's conclusory statement that the lack of permanent fillings at the jail has caused long-term tooth deterioration in the inmate population is not supported by the evidence, is not reliable and is inadmissible.

Finally, Dr. Sturm's opinions about what the jail's dental policies "should" be, with her stated goal of improving inmates' overall dental health, are inadmissible.  Such opinions are unsupported by facts or citations to any established medical/dental criteria for jails.  These opinions are also irrelevant to the issues in the instant case of whether defendants had an extractions-only policy during plaintiff's incarceration and whether defendants were deliberately indifferent to Mounce's serious dental needs.

Dr. Sturm's speculative and irrelevant conclusions will not assist the trier of fact to determine any fact in issue and are excluded. See Toguchi v. Chung, 391 F.3d 1051, 1059-60 (9th Cir. 2004) ("Although [plaintiff's medical expert] opined that [prison doctor] Dr. Chung 'disregarded [the] serious and known risks' of combining the three drugs [that led to inmate's death from a drug overdose], his conclusion was merely speculative, because he lacked any insight into Dr. Chung's subjective knowledge."); Woods, 110 F.3d at 1219-21 (Trial court properly prohibited plaintiff's expert from stating that defendants were deliberately indifferent. Such testimony "attempts to tell the jury what result to reach and . . . runs the risk of interfering with a district court's jury instructions . . . . [W]hether a prison official acted with deliberate indifference depends on that official's state of mind.  Thus, by expressing the opinion that [defendant] was deliberately indifferent, [the expert] gives the false impression that he knows the answer to this inquiry, which depends on [defendant's] mental state."); First United Fin. Corp. v. U.S. Fid. & Guar. Co., 96 F.3d 135, 136 (5th Cir. 1996) (Expert witnesses' "opinion of dishonesty goes beyond the scope of expertise.  They looked at [the evidence] and concluded that O'Dom was dishonest.  Their conclusion will not substitute for evidence of dishonesty.  By their knowledge of banking practices they may only assist and not replace the fact finder."); Matthews v. Ashland Chem., Inc., 770 F.2d 1303, 1310 (5th Cir. 1985) ("Matthews did attempt to ask his expert 'who's responsible' for filling the cylinders under the fire code. . . .  It was within the trial court's discretion to disallow the question on the ground that it required the witness to state a conclusion of law about legal

16

responsibility for the accident."); Al-Turki, 2013 WL 603109, at *5 ("[E]ven if [plaintiff's medical expert] avoids the term 'deliberately indifferent,' but his testimony nevertheless opines on Defendant's knowledge and intent, he is without personal knowledge and rendering an opinion which is outside the scope of his expertise.  [The expert] is not qualified to testify about Defendant's state of mind.").

Therefore, Dr. Sturm's report is admissible to the limited extent that she opines about general standards of dentistry care, the content of the records she reviewed, the treatments and procedures that were actually offered to and performed on Mounce and other inmates at the jail, and whether, in her opinion based on the record evidence rather than speculation, the St. Tammany Parish Jail had an extractions-only policy.  Her report beyond this limited scope, however, will not be admitted.

## II.   SUMMARY JUDGMENT STANDARDS

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Rule 56, as revised effective December 1, 2010, establishes new procedures for supporting factual positions:

(1)  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

17

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> (2)  Objection That a Fact Is Not Supported by Admissible Evidence.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> (3)  Materials Not Cited.  The court need consider only the cited materials, but it may consider other materials in the record.
>
> (4)  Affidavits or Declarations.  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Thus, the moving party bears the initial burden of identifying those materials in the record that it believes demonstrate the absence of a genuinely disputed material fact, but it is not required to negate elements of the nonmoving party's case.  Capitol Indem. Corp. v. United States, 452 F.3d 428, 430 (5th Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to [a particular material] fact."  Advisory Committee Notes, at 261.

To withstand a properly supported motion, the nonmoving party who bears the burden of proof at trial must cite to particular evidence in the record to support the essential elements of its claim.  National Ass'n of Gov't Employees v. City Pub. Serv.

Bd., 40 F.3d 698, 712 (5th Cir. 1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 321-

23 (1986)); accord U.S. ex rel. Patton v. Shaw Servs., L.L.C., 418 F. App'x 366, 371 (5th

Cir. 2011).   "[A] complete failure of proof concerning an essential element of the

nonmoving party's case renders all other facts immaterial."   Celotex, 477 U.S. at 323;

accord U.S. ex rel. Patton, 418 F. App'x at 371.

If the movant bears the burden of proof on an issue, either because the movant is

the plaintiff or a defendant asserting an affirmative defense, the movant must "'establish

beyond peradventure all of the essential elements of the [claim or] defense'" to warrant

judgment in its favor.   United States v. Renda Marine, Inc., 667 F.3d 651, 659 (5th Cir.

2012) (quoting Addicks Serv., Inc. v. GGP-Bridgeland, LP, 596 F.3d 286, 293 (5th Cir.

2010)); accord Meecorp Capital Mkts. LLC v. Tex-Wave Indus. LP, 265 F. App'x 155,

158 (5th Cir. 2008) (citing Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986));

Smoothie King Franchises, Inc. v. Southside Smoothie & Nutrition Ctr., Inc., No. 11-

2002, 2012 WL 1698365, at *3 (E.D. La. May 15, 2012), aff'd, 516 F. App'x 362 (5th

Cir. 2013).

At the summary judgment stage of a Section 1983 action, however,

a defendant asserting immunity is not required to establish the defense
beyond peradventure, as he would have to do for other affirmative defenses.
"The moving party is not required to put forth evidence to meet its summary
judgment burden for a claim of immunity.  It is sufficient that the movant
in good faith pleads that it is entitled to absolute or qualified immunity."
"Once the [movant] asserts this affirmative defense, the burden shifts to the
plaintiff to rebut it."

Cousin v. Small, 325 F.3d 627, 632 (5th Cir. 2003) (footnote omitted) (quoting Beck v. Tex. State Bd. of Dental Exam'rs, 204 F.3d 629, 633-34 (5th Cir. 2000)); accord Clayton v. Columbia Cas. Co., 547 F. App'x 645, 649 (5th Cir. 2013) (citing Crostley v. Lamar Cnty., 717 F.3d 410, 422 (5th Cir. 2013); Tolan v. Cotton, 713 F.3d 299, 304 (5th Cir. 2013, rev'd on other grounds, No. 13-551, 2014 WL 1757856, at *4 (U.S. May 5, 2014)); Morgan v. Tex. Dep't of Crim. Justice, 537 F. App'x 502, 508 (5th Cir. 2013) (citing Rockwell v. Brown, 664 F.3d 985, 990-91 (5th Cir. 2011)).

Thus, "'the burden is on the plaintiff to prove that a government official is not entitled to qualified immunity.'" Doe v. Robertson, No. 13-50459, 2014 WL 1796653, at *3 (5th Cir. May 6, 2014) (quoting Wyatt v. Fletcher, 718 F.3d 496, 502 (5th Cir. 2013)) (emphasis added).

> In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right. . . .
>
> The second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation. Governmental actors are shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The salient question . . . is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional.
>
> Courts have discretion to decide the order in which to engage these two prongs. But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.

Tolan v. Cotton, 134 S. Ct. 1861, 1865-66 (2014) (quotations and citations omitted).

In the Fifth Circuit, "[a] right is clearly established if 'existing precedent [has] placed the statutory or constitutional question beyond debate.'" Doe, 2014 WL 1796653, at *3 (quoting Morgan v. Swanson, 659 F.3d 359, 371 (5th Cir. 2011)).   A "clearly established law must derive from 'controlling authority–or a robust consensus of persuasive authority–that defines the contours of the right in question with a high degree of particularity' at the time of [the] challenged conduct." Id. at *6 (quoting Wyatt, 718 F.3d at 503).  "If the first step is satisfied, we must 'determine whether the defendant's conduct was objectively reasonable.'" Id. at *3 (quoting Wyatt, 718 F.3d at 503).

"To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present absolute proof, but must offer more than mere allegations.'" Manis v. Lawson, 585 F.3d 839, 843 (5th Cir. 2009) (quoting Ontiveros v. City of Rosenberg, 564 F.3d 379, 382 (5th Cir. 2009)) (internal quotations and citation omitted).

A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). No genuine dispute of material fact exists if a rational trier of fact could not find for the nonmoving party based on the evidence presented.  Nat'l Ass'n of Gov't Employees, 40 F.3d at 712.

"Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."  Edwards v. Your Credit, Inc., 148 F.3d 427, 432 (5th Cir. 1998); accord Murray v. Earle, 405 F.3d 278, 284 (5th Cir. 2005).  "We do not, however, in the absence of any

proof, assume that the nonmoving party could or would prove the necessary facts."
Badon v. R J R Nabisco Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quotation omitted)
(emphasis in original). "Conclusory allegations unsupported by specific facts . . . will not
prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations .
. . to get to a jury without any "significant probative evidence tending to support the
complaint."'" Nat'l Ass'n of Gov't Employees, 40 F.3d at 713 (quoting Anderson, 477
U.S. at 249).

"Moreover, the nonmoving party's burden is not affected by the type of case;
summary judgment is appropriate in any case where critical evidence is so weak or
tenuous on an essential fact that it could not support a judgment in favor of the
nonmovant." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation
omitted) (emphasis in original); accord Duron v. Albertson's LLC, 560 F.3d 288, 291 (5th
Cir. 2009).

III.   UNDISPUTED FACTS

The following material facts, the vast majority of which have been stipulated by
the parties, Record Doc. No. 82, are accepted as undisputed solely for purposes of the
pending cross-motions for summary judgment.

Mounce was arrested on February 1, 2011.  On February 2, 2011, he was booked
into the St. Tammany Parish Jail, where he remained until March 19, 2012.

Richard Demaree Inglese, M.D., has been the medical director and Major Gregory
Longino has been the warden  at the St. Tammany Parish Jail since before February 2,

2011, until the present.  Rodney J. "Jack" Strain has been the Sheriff of St. Tammany Parish since before February 2, 2011, until the present.

Since before February 2, 2011 and until the present, Gary Bencsek, D.D.S., and Michael L. Leggio, D.D.S., were the only dentists performing dental services at the St. Tammany Parish Jail.  Drs. Leggio and Bencsek both have extensive histories of practicing dentistry within correctional facilities like the St. Tammany Parish Jail.  Both dentists practiced at Orleans Parish Prison before working at the St. Tammany Parish Jail. Since 2005, Dr. Leggio has also practiced dentistry at Avoyelles Correctional Center, a state prison in Cottonport, Louisiana.  Dr. Inglese deposition, Record Doc. No. 67-6 at pp. 52-54 (pp. 49-51 of deposition transcript); Dr. Leggio deposition, Record Doc. No. 67-9 at pp. 7-8, 57, 93; Dr. Leggio resumé, Record Doc. No. 60-10; Dr. Bencsek resumé, Record Doc. No. 60-11.

Sheriff Strain is a policymaker for all purposes pursuant to 42 U.S.C. § 1983 and is ultimately responsible for all administrative functioning at the St. Tammany Parish Jail. Warden Longino is a policymaker for all purposes pursuant to 42 U.S.C. § 1983 and is ultimately responsible for all administrative functioning at the St. Tammany Parish Jail, subject only to those officials above him in the Sheriff's Office chain of command, which ends with Sheriff Strain.  Dr. Inglese is a policymaker for all purposes pursuant to 42 U.S.C. § 1983 as to the Medical Department at the St. Tammany Parish Jail, subject only to those officials above him in the Sheriff's Office chain of command, which ends with Sheriff Strain.  Warden Longino has the authority to request the transfer of Department

23

of Corrections inmates, but the authority to make transfers lies with the Department of Public Safety and Corrections. Dr. Inglese is the first level of review for all grievances connected to medical care, Warden Longino is the second step and Sheriff Strain is the third and final step.

Extractions of teeth constitute 80 to 90 percent of the dental care provided at the St. Tammany Parish Jail. This percentage is in line with Dr. Inglese's professional experience as the previous Medical Director at Orleans Parish Prison for more than five years and as a medical consultant at 16 other parish jails in Louisiana. This large percentage is, at least in part, a function of the inmate population. The "overwhelming majority of [inmates] . . . do not get any sort of regular care before coming to the jail. So they have terrible, terrible, terrible teeth," and the majority of inmates do not want to pay the required co-payment to see a jail dentist until they "are in excruciating pain and the reason they're in excruciating pain is because they have these teeth that are incredibly unsalvageable. The only treatment is extraction. The very few who have salvageable teeth, they're probably only going to stay [at the jail an average of] four months and so the dentist is going to do a temporary filling." Dr. Inglese deposition, Record Doc. No. 67-6 at pp. 156-57 (pp. 148-49 of deposition transcript); Dr. Inglese affidavit, Record Doc. No. 60-9 at ¶¶ 6, 9, 27-28; see also deposition of Dr. Michael L. Leggio, D.D.S., Record Doc. No. 67-9 at pp. 12-13 ("[T]he majority of people that you see in St. Tammany [Parish Jail are] going to be [in] acute pain . . . because there's some acute problem.").

24

The St. Tammany Parish Sheriff's Office Medical Department Policy and Procedure Manual, dated July 12, 2012, states that the dental treatments available at the jail include extractions, filing chipped or sharp teeth, temporary fillings, treatment of periodontal disease, wisdom teeth extraction, fabrication of dentures and referral to an off-site specialist for emergent problems.  Record Doc. No. 60-14 at pp. 2-3.  The Manual also states:  "Dental services at the jail will NOT be limited to tooth extractions."  Id. at p. 1.

Dr. Inglese, in consultation with Dr. Bencsek, revised this portion of the Manual on July 12, 2012, four months after Mounce filed this lawsuit, to expand the list of dental services that were actually being performed. The jail did not keep a copy of the prior version of the Manual.  However, the revision did not change the jail's pre-existing policy that dental services were not limited to tooth extractions and included all of the listed services.  The St. Tammany Parish Jail's medical policy complies with all Department of Corrections guidelines.  Dr. Inglese deposition, Record Doc. No. 67-6 at pp. 84-97, 102-03, 264-65 (pp. 79-92, 97, 250-51 of deposition transcript); Dr. Inglese affidavit, Record Doc. No. 60-9 at ¶¶ 14-15; deposition of Greg Longino, Record Doc. No. 67-5 at pp. 45-46, 50, 81.

Drs. Bencsek and Leggio performed other types of dental treatment at the jail besides extractions, such as enameloplasty, removal of arch bars and orthodontic braces, temporary fillings, x-rays, treatment of periodontal disease, recontouring and smoothing of sharp teeth, equilibration, removal and/or re-cementing of crowns, adjustments of

partials and dentures, and tooth desensitization. They prescribed medications for pain and provided dental wax and mouth rinses. Dr. Inglese affidavit, Record Doc. No. 60-9 at ¶ 15; Dr. Bencsek deposition, Record Doc. No. 67-7 at p. 26; Dr. Inglese deposition, Record Doc. No. 67-6 at pp. 157, 176 (pp. 149, 167 of deposition transcript); Dr. Leggio deposition, Record Doc. No. 67-9 at p. 46.

Mounce submitted a Sick Call Request on May 5, 2011, seeking treatment for two of his teeth, one of which he said was "causing severe pain." Sick Call Request dated May 5, 2011, Record Doc. No. 60-4 at p. 1; declaration under penalty of perjury of Stephen Dale Mounce, Record Doc. No. 67-4 at ¶ 9. Plaintiff asserts that he told a nurse during pill call at the St. Tammany Parish Jail that he needed a filling replaced and that the nurse told him that all the dentists at the jail can do is extract teeth. Mounce states that other inmates told him before he submitted his Sick Call Request that extraction was the only dental treatment offered at the jail. Mounce declaration, Record Doc. No. 67-4 at ¶ 11.

George Duffy knows Mounce because Duffy is currently incarcerated at Rayburn and was incarcerated at the St. Tammany Parish Jail from September 2009 to February 2012. Duffy states in his declaration that he was also told by other inmates at the St. Tammany Parish Jail that extraction was the only treatment offered. Declaration under penalty of perjury of George Duffy, Record Doc. No. 67-8 at ¶ 13.

Plaintiff was examined by Dr. Leggio on May 28, 2011. Dr. Leggio told Mounce that his number 2 tooth, the one that plaintiff said had a lost filling, was "restorable." Dr.

Leggio did not recommend extraction of that tooth.  He noted that Mounce's number 16 tooth may need to be extracted at some point.  Dr. Leggio's opinion regarding plaintiff's tooth number 2 was based on visual evaluation.  No x-ray was taken on May 28, 2011. Dental Clinic notes dated May 28, 2011, Record Doc. No. 60-4 at pp. 2-3; Mounce declaration, Record Doc. No. 67-4 at ¶¶ 12-13; deposition of Michael L. Leggio, D.D.S., Record Doc. No. 67-9 at pp. 46-53.

Mounce states that Dr. Leggio asked him, "How much time do you have?" Plaintiff claims that, when he said he had not yet received his sentence, Dr. Leggio advised him to wait and see how much time he would get because "all we can do is pull it," referring to tooth number 2.  Plaintiff's testimony at <u>Spears</u> hearing, Record Doc. No. 60-5 at p. 9; Mounce declaration, Record Doc. No. 67-4 at ¶¶ 15-16.

Dr. Leggio does not recall treating Mounce on this or any date, but his treatment notes for May 28, 2011, contain no notation that Dr. Leggio told Mounce to wait to have his tooth number 2 treated.  Dr. Leggio sometimes asks inmates whether they received their sentences yet because it is one factor that helps him determine their care.  In some circumstances, he may recommend that an inmate wait to seek treatment because the inmate might be released from jail imminently.  Dr. Leggio denies that he ever told Mounce or any inmate that the jail dentists can only pull teeth.  Dr. Leggio deposition, Record Doc. No. 67-9 at pp. 56-57, 63-64.

Dr. Leggio did not offer Mounce a temporary or permanent filling at the May 28, 2011 visit.  Dr. Leggio believed that Mounce's pain, symptoms and tooth decay would

increase if his tooth was not treated.  As a result of this examination, Dr. Leggio prescribed Ultram,[4] ibuprofen,[5] Amoxil[6] (an antibiotic) and Peridex mouth rinse.[7]  He also provided Mounce with some dental wax for use on tooth number 2.  Dental Clinic notes dated May 28, 2011, Record Doc. No. 60-4 at pp. 2-3.  Dental wax is placed in the tooth cavity to create a barrier against food and water and reduce pain.  Mounce states that he soon had to discontinue taking the ibuprofen because it caused him stomach pain.

Mounce asserts in his declaration that, "[a]fter the May 28, 2011 examination, I began suffering from severe pain in tooth number 2, fluctuating from bearable to intense. . . . I began having trouble sleeping, chewing solid food, had sensitivity when drinking cold drinks, had throbbing pain in my mouth and jaw, and had a foul taste in my mouth.  The pain was so intense that I was unable to eat my regular amount of food."  Mounce declaration, Record Doc. No. 67-4 at ¶¶ 18-19.  Duffy declares that, while he and plaintiff were incarcerated at the St. Tammany Parish Jail, "Mounce was in constant pain and had trouble eating," and that Duffy "believe[s that] Mr. Mounce was in serious pain."

------

[4]Ultram (generic name:  tramadol) "is an opioid analgesic (pain killer) that is used in the management of moderate to moderately severe pain" in adults.  PDRhealth.com (2014 PDR Network, LLC), http://www.pdrhealth.com/drugs/ultram (visited May 6, 2014).

[5]Ibuprofen is a nonsteroidal anti-inflammatory drug that works by reducing hormones that cause inflammation and pain in the body.  Everyday Health.com (2014 Everyday Health Media, LLC), http://www.everydayhealth.com/drugs/ibuprofen-oxycodone (visited May 6, 2014).

[6]Amoxil (generic name:  amoxicillin) is a form of penicillin, which is an antibiotic used to fight many infections.  Id.  http://www.everydayhealth.com/health-center/penicillins-for-pneumonia.aspx (visited May 6, 2014).

[7]Peridex (generic name:  chlorhexidine) is an oral rinse that reduces bacteria in the mouth.  PDRhealth.com, http://www.pdrhealth.com/drugs/peridex (visited May 6, 2014).

Duffy also states that plaintiff's cheek was visibly swollen.  Duffy declaration, Record Doc. No. 67-8 at ¶¶ 7, 8, 10.  Dr. Leggio testified that, "if I put [Mounce] on some antibiotics, he's got [to] have some swelling in the area."  Dr. Leggio deposition, Record Doc. No. 67-9 at p. 59.

Mounce did not submit any Sick Call Request forms regarding dental care between May 28 and September 30, 2011.  On August 29, 2011, Mounce pled guilty to two felony counts and was sentenced to two concurrent, ten-year terms of incarceration.  On the same date, his formal custody was transferred to the Louisiana Department of Corrections, but he remained housed at the St. Tammany Parish Jail.  On August 31, 2011, Mounce filed a Request Form, asking to discuss what he claimed was an extraction-only dental policy that was revealed to him during his visit with Dr. Leggio.  Plaintiff's request also said, "This [policy] was ruled unconstitutional by the courts in the case of Heitman v. Gabriel." St. Tammany Parish Jail Request Form dated August 31, 2011, Record Doc. No. 60-3 at p. 5 (also at Record Doc. No. 2 at p. 9).

Dr. Inglese issued a written response on September 2, 2011, and met with Mounce the same day, stating in writing and telling Mounce orally that St. Tammany Parish Jail did <u>not</u> have an extraction-only policy.  Dr. Inglese explained that numerous dental procedures other than extractions were offered and performed by the jail's dentists, and that more serious cases were sent either to the Medical Center of Louisiana or a local oral surgeon.  Dr. Inglese provided Mounce with additional dental wax and said that he would schedule plaintiff for another dental sick call with another dentist.  Mounce declaration,

Record Doc. No. 67-4 at ¶¶ 23-24; Response to Inmate Request Form, Record Doc. No. 60-3 at p. 6; Physician's Orders dated September 2, 2011, Record Doc. No. 60-4 at p. 4; Dr. Inglese deposition, Record Doc. No. 67-6 at pp. 175-77 (pp. 165-68 of deposition transcript). Dr. Inglese met with Dr. Bencsek on more than one occasion to discuss Mounce's medical condition. Dr. Inglese deposition, Record Doc. No. 67-6 at pp. 214-16 (pp. 203-04 of deposition transcript).

Dr. Bencsek examined plaintiff on September 12, 2011. Mounce told the dentist: "I want my tooth filled and I have another tooth that is sensitive." Dr. Bencsek noted that tooth numbers 2 and 16 contained extensive decay. The focus of this visit, however, was on tooth number 2. Dr. Bencsek noted that tooth "#2 has extensive buccal decay. A[n] x-ray taken. #2 is not restorable with a 'filling.' It possibly could be restored with extensive dentistry (root canal therapy, buildup and crown)." Dr. Bencsek desensitized tooth number 19. He did not treat or make a recommendation regarding tooth number 16 because that tooth was not posing any problems for plaintiff that day. Dental Clinic notes, Record Doc. No. 60-4, at p. 5; Mounce declaration, Record Doc. No. 67-4 at ¶ 25; Dr. Bencsek deposition, Record Doc. No. 67-7 at pp. 32-42; Dr. Leggio deposition, Record Doc. No. 67-9 at p. 66. Defendants are unable to locate the x-ray that Dr. Bencsek took at that visit.

Dr. Bencsek recommended extraction of Mounce's number 2 tooth and did not give plaintiff any other treatment options for that tooth. Mounce refused to have his number 2 tooth pulled, and he signed a dental refusal form. Dr. Bencsek's notes state that Mounce

said he did not want the tooth extracted because he thought it would be difficult to chew, since he had previously had tooth number 30 extracted. However, Dr. Bencsek believed that Mounce would still be able to chew after extraction of tooth number 2 because his remaining teeth would be sufficient. Mounce declaration, Record Doc. No. 67-4 at ¶¶ 28-29; Dr. Bencsek deposition, Record Doc. No. 67-7 at pp. 34, 37; Dental Clinic notes, Record Doc. No. 60-4 at pp. 5; Dental Refusal form, Record Doc. No. 60-4 at p. 7. Dr. Bencsek prescribed Ultram for Mounce, as is customary for dental visits at the St. Tammany Parish Jail. He did not offer a temporary filling because, based on the amount of decay in the tooth, he did not believe it would work. Dr. Bencsek deposition, Record Doc. No. 67-7 at pp. 37, 40; Dentist Orders, Record Doc. No. 60-4 at p. 6.

The St. Tammany Parish Jail does not provide permanent fillings for decaying teeth. It does not have the materials to provide permanent fillings. Medical Department Policy and Procedure Manual, Record Doc. No. 60-14 at pp. 2-3; Dr. Inglese deposition, Record Doc. No. 67-6 at p. 99; Dr. Bencsek deposition, Record Doc. No. 67-7 at p. 21.

On September 30, 2011, Mounce was attacked by another inmate and was punched on the left side of his face. Among other injuries, he suffered a cracked tooth on his bottom left, second-from-the-back molar (tooth number 18). The emergency room doctor who treated plaintiff after this attack recommended that he follow up with a dentist. Mounce declaration, Record Doc. No. 67-4 at ¶¶ 33-35; LSU Hospitals Offender Collaborative Care Communication Form, Summary of Care and Recommendations dated September 30, 2011, Record Doc. No. 67-14.

31

On October 15, 2011, Mounce met with Dr. Leggio in a dental sick call. According to plaintiff, he was seeking treatment for his number 18 tooth, which had been chipped during the September 30, 2011 altercation, and the other tooth from which he had previously lost a filling. Dr. Leggio did not examine either tooth. He noted that Mounce had a 10-year sentence. Mounce declaration, Record Doc. No. 67-4 at ¶¶ 37-38; Dental Clinic notes dated October 15, 2011, Record Doc. No. 60-4 at p. 8.

When asked why he did not examine the chipped tooth number 18 at this visit, Dr. Leggio testified that plaintiff "did not want to hear about having the tooth extracted." Based on his clinic notes, Dr. Leggio stated that he did not examine tooth number 18 because Mounce did not complain of any symptoms related to it and because "that was not the main issue on that visit. [Plaintiff's] main issue," the "more pressing" issue, was tooth number 2. During the visit, Dr. Leggio reviewed Mounce's file, including Dr. Bencsek's notes and the x-ray taken on September 12, 2011, and talked with plaintiff about his symptoms. Mounce reported that his "primary pain" was in tooth number 2. Based on this discussion and his chart review, Dr. Leggio offered to relieve plaintiff's pain by extracting tooth number 2, which Dr. Leggio testified was "a very guarded tooth, a nonrestorable tooth." Dr. Leggio had Mounce fill out a dental refusal form because, according to his notes, plaintiff "refuses extraction**s** today." (Emphasis added). Dr. Leggio wrote on the dental refusal form that plaintiff "refused extraction of [illegible] t**ee**th." (Emphasis added). However, Dr. Leggio testified that Mounce "elected

32

not to have the **too**th removed" (emphasis added), and Dr. Leggio denied that he had offered to extract tooth number 18 in addition to tooth number 2. Dr. Leggio deposition, Record Doc. No. 67-9 at pp. 68-71, 76-77, 79-80; Dental Clinic notes dated October 15, 2011, Record Doc. No. 60-4 at p. 8; Dental Refusal Form dated October 15, 2011, Record Doc. No. 67-12; Mounce declaration, Record Doc. No. 67-4 at ¶¶ 38, 40.

During the October 15, 2011 visit, Mounce asked for "restorative treatment." Dental Clinic notes dated October 15, 2011, Record Doc. No. 60-4 at p. 9; Sick Call Request to Dr. Inglese dated October 18, 2011, Record Doc. No. 60-4 at p. 9. According to plaintiff, "Dr. Leggio told me that all he could do was pull teeth." Mounce declaration, Record Doc. No. 67-4 at ¶ 39; Mounce testimony at <u>Spears</u> hearing, Record Doc. No. 60-5 at p. 16. Dr. Leggio prescribed two days of Ultram and five days of ibuprofen for plaintiff. Dr. Leggio did not give Mounce any dental wax because the clinic had run out of it. Dental Clinic notes dated October 15, 2011, Record Doc. No. 60-4 at pp. 8-9; Mounce declaration, Record Doc. No. 67-4 at ¶ 41. According to plaintiff, he continued to suffer "severe pain" in both tooth numbers 2 and 18 after this appointment. Record Doc. No. 67-4 at ¶¶ 42-43.

On October 18, 2011, Mounce filed a Sick Call request directed to Dr. Inglese to address his dental treatment and his newly broken tooth, which had not been examined or treated. He expressed in general terms his dissatisfaction with the dental care being provided to him, and he reiterated his belief that the St. Tammany Parish Jail had an extraction-only treatment policy. He stated: "A written policy does not exempt the jail

33

from repercussions if the actual practice is not the same as the written policy."  Sick Call Request dated October 18, 2011, Record Doc. No. 60-4 at p. 9; Mounce declaration, Record Doc. No. 67-4 at ¶ 44.

Dr. Inglese met with Mounce the next day to discuss his complaints.  Dr. Inglese again denied that the jail had an extraction-only policy.  He prepared a lengthy, typed "Physician Note – Note to Chart," in which he stated that he had discussed Mounce's treatment with him and that, after three dental visits and an x-ray, both Drs. Bencsek and Leggio felt that tooth number 2 was not restorable and that extraction was the appropriate treatment.  Regarding Mounce's report to Dr. Leggio on October 15, 2011, that another tooth had broken off, Dr. Inglese noted that Dr. Leggio had explained to plaintiff "that these issues would require extractions," but that "Mounce again refused extractions . . . and requested pain medications instead."  Dr. Inglese concluded:  "We are not denying [plaintiff] restorative care; he is not a candidate for it."  Dr. Inglese also noted that Mounce "has . . . repeatedly threatened lawsuits – for dental and for other issues.  He is a very difficult and manipulative patient, so I wish to be very clear for the medical record.  We have offered the appropriate dental care to Mr. Mounce, and he has refused it."  Dr. Inglese further noted that plaintiff was refusing medications such as ibuprofen or Tylenol, and only wanted Ultram, which Dr. Inglese felt demonstrated "a very real possibility that [Mounce] is refusing extractions in order to procure pain medications on a long-term basis."  Physician Note – Note to Chart dated October 19, 2011, Record Doc. No. 60-4 at p. 10; Mounce declaration, Record Doc. No. 67-4 at ¶ 45.

On November 8, 2011, Mounce filed an inmate grievance regarding the jail's alleged extraction-only policy. He stated that he had been told in May 2011 that his tooth was repairable, but he had not been offered that treatment. He also complained that the dentist recommended extraction of his broken tooth "without even looking in my mouth." Inmate Complaint Form, Record Doc. No. 2 at p. 11.[8]

Dr. Inglese met with Mounce the same day and submitted a written response to his grievance. Dr. Inglese stated that he had "already met with [Mounce] and discussed this issue at length" and that he would "not address the issue again" after this meeting. Dr. Inglese said he had talked with Dr. Bencsek about Mounce's complaint and that Dr. Bencsek had opined that there was a "remote possibility" that tooth number 2 could be saved with "extensive dental intervention," but that even with such intervention, "the tooth may still be unsalvageable." Dr. Inglese noted that Mounce had been seen by two dentists, who "[b]oth feel that extraction is the appropriate treatment. . . . You have refused extraction." Dr. Inglese explained that the jail is "obligated to care for an inmate's serious . . . dental . . . needs. We certainly are not required to provide [or] offer such exhaustive restorative services for every decayed tooth of every inmate, especially when there is a good possibility that the tooth would still be lost." Dr. Inglese stated that, if Mounce changed his mind and submitted a sick call request, he would be scheduled for

---

[8]This grievance is not in the summary judgment record, but is attached to plaintiff's original complaint. Record Doc. No. 2 at p. 11. The parties have stipulated that Mounce submitted the grievance that contains the quoted language. Joint Stipulation of Uncontested Facts, Record Doc. No. 82 at ¶ 60.

tooth removal.  Response to Inmate Request Form dated November 8, 2011, Record Doc. No. 60-3 at p. 7; Mounce declaration, Record Doc. No. 67-4 at ¶¶ 47-48.

On November 16, 2011, Mounce filed another grievance regarding the dental department's "refusal to repair my damaged teeth.  They have only offered extraction for my teeth even though in one instance, the damaged tooth has not even been examined." Inmate Grievance dated November 16, 2011, Record Doc. No. 60-3 at p. 8; Mounce declaration, Record Doc. No. 67-4 at ¶ 49.  Dr. Inglese responded to Mounce's grievance on November 21, 2011.  Dr. Inglese stated that "I have personally met with you on two occasions and discussed this matter in detail.  I have also provided you with extensive written explanations.  I will not address the matter again."  Response to Grievance dated November 21, 2011, Record Doc. No. 60-3 at p. 9.

Mounce requested a Warden's review of his grievance the same day.  Id.  Warden Longino then met with Dr. Inglese to discuss plaintiff's grievance.  Warden Longino decided that the issues Mounce had raised would not be addressed again.  Longino deposition, Record Doc. No. 67-5 at pp. 70-71.  Dr. Inglese encouraged Warden Longino to transfer plaintiff to another correctional facility because the jail had already provided him with three dental visits and the treatment recommendations of two dentists, with which Mounce disagreed; Dr. Inglese had responded four times to plaintiff's grievances; there was nothing more the jail's medical department could do for Mounce; and Dr. Inglese would not send plaintiff to Charity Hospital for a third opinion, which he believed would be a waste of time for both the Sheriff's and the hospital's personnel.  Offsite

referrals are done only if the necessary care cannot be delivered onsite, and here both

dentists had opined that extraction was the necessary care, which can be done onsite.  Dr.

Inglese deposition, Record Doc. No. 67-6 at pp. 233-36 (pp. 221-24 of deposition

transcript).

Warden Longino met with Mounce several days later.  Plaintiff claims that Warden

Longino told him that extraction was the only service offered at the St. Tammany Parish

Jail.  Mounce declaration, Record Doc. No. 67-4 at ¶¶ 52-54.  Warden Longino told

plaintiff that he would be transferred to a Department of Corrections facility, so that

plaintiff could be evaluated again and have access to other dental treatment.  Warden

Longino sought and received approval from the Department of Corrections to send

Mounce to Elayn Hunt Correctional Center because it was a "facility that would evaluate

him properly and get him to the appropriate facility" for his needs. Longino deposition,

Record Doc. No. 67-5 at pp. 25-27, 82-83; December 28, 2011 Transfer Request Form for

DOC Offenders with Medical/Mental Health Needs, Record Doc. No. 60-3 at p. 10.

Plaintiff's witness Duffy declares that he was seen by Dr. Leggio at the St.

Tammany Parish Jail on February 25, 2012, when he sought treatment of a small cavity

in his bottom left last molar.  Duffy claims that Dr. Leggio acknowledged that Duffy had

a cavity, although Dr. Leggio never examined his tooth.  Duffy also alleges that Dr.

Leggio told him that the jail only pulled teeth and that Dr. Leggio could not provide other

treatment.  According to Duffy, he refused the extraction of his tooth and signed a Dental

Refusal form.  Dr. Leggio offered to give Duffy something for the pain, which Duffy says he also refused.  Duffy declaration, Record Doc. No. 67-8 at ¶¶ 12, 15-19.

The jail's grievance records include a complaint by another inmate (whose name has been redacted for the sake of privacy) during the time that Mounce was incarcerated, which states:  "Dentist told me he only pulled teeth."  Inmate Complaint Form dated August 3, 2011, Record Doc. No. 67-15.

Plaintiff was transferred to Hunt Correctional Center on March 19, 2012, which had no available dentist.  He was sent to Rayburn on April 16, 2012.  Rayburn offers the treatment of dental fillings in addition to the treatment of extraction for decaying teeth.  Mounce declaration, Record Doc. No. 67-4 at ¶¶ 58-59; Dr. Sutherland declaration, Record Doc. No. 67-11 at ¶ 30.

On June 25, 2012, Dr. Sutherland examined Mounce at Rayburn and concluded that his number 2 tooth was a "high-risk tooth," meaning that, if left untreated, it would continue to deteriorate and that, based on the extent of the damage already, there was a chance that a filling would not be sufficient and the tooth might require extraction or a root canal.  Dr. Sutherland believed there was an 80% chance that the tooth would require extraction.  After explaining the risks of the proposed treatments and outcomes, Dr. Sutherland gave plaintiff the choice of restoration with a filling or extraction of his number 2 tooth.  Mounce wanted to save this tooth and requested a filling, which Dr. Sutherland performed on July 9, 2012.  Dr. Sutherland declaration, Record Doc. No. 67-11 at ¶¶ 6-11, 14, 17; Mounce declaration, Record Doc. No. 67-4 at ¶ 63.

Dr. Leggio similarly testified that, when he saw Mounce on October 15, 2011, based on the notes of his own examination of Mounce on May 28, 2011 and Dr. Bencsek's examination notes and the x-ray taken on September 12, 2011, plaintiff's number 2 tooth would have continued to deteriorate and to cause increased pain without treatment. Dr. Leggio stated that he believed on October 15, 2011, that the tooth did not have enough foundation to be saved and that extraction was the treatment of choice. Dr. Leggio deposition, Record Doc. No. 67-9 at pp. 72-73. He testified that he was being "cautiously optimistic" when he wrote on May 28, 2011, that the tooth was "restorable," and that his review of the x-ray taken in September accounted for the difference between his initial opinion in May and his second opinion on October 15, 2011, that the tooth should be extracted. Id. at pp. 83-85.

On June 25, 2012, Dr. Sutherland also examined plaintiff's number 18 tooth, which had been broken in the altercation on September 30, 2011. Dr. Sutherland found that this tooth was not as deeply damaged as tooth number 2, was not a high-risk tooth and was a clear candidate for a filling. Mounce elected to have tooth number 18 restored with a filling, which Dr. Sutherland did on August 15, 2012. Dr. Sutherland declaration, Record Doc. No. 67-11 at ¶¶ 15-16, 18. Dr. Sutherland last examined plaintiff's teeth on March 13, 2013. Dr. Sutherland opined that, as of that date, all of Mounce's teeth look fine and the fillings on tooth numbers 2 and 18 have successfully restored these teeth. Dr. Sutherland declaration, Record Doc. No. 67-11 at ¶¶ 34-36.

Dr. Leggio testified that the long-term outlook for plaintiff's number 2 tooth is still unclear after Dr. Sutherland filled it.  Even if Mounce is now symptom-free, Dr. Leggio opined that plaintiff might still have a necrotic pulp in the tooth, which will cause the tooth to die, or plaintiff could develop an abscess because of the depth of the decay.  Dr. Leggio deposition, Record Doc. No. 67-9 at pp. 82-83.

Plaintiff's expert witness, Dr. Sturm, is a dentist with 30 years of experience as a general dentist.  Report of Kathryn Sturm, D.D.S., dated November 13, 2013, Record Doc. No. 60-12 at p. 2.  She never personally examined plaintiff's teeth.  Dr. Sturm's review of a randomly selected sample of inmate dental records provided by the St. Tammany Parish Jail revealed that 91.4 percent of them contained either an extraction, post-operative treatment for an extraction or a recommendation that extraction is the best course of treatment.  Id. at pp. 4-7.  Only 10 of the 116 records did not contain an extraction, post-operative treatment for an extraction or a recommendation that extraction is the best course of treatment.  Id. at p. 5.  Besides extractions, the other procedures in the records that Dr. Sturm reviewed were palliative treatments including temporary fillings, enameloplasties, wax being provided, only pain medication being offered and re-cementing either a veneer or a crown.

There were three temporary fillings in the records that Dr. Sturm reviewed.  Id. at pp. 4, 7-8.  In two, the patients specifically requested a filling.  Dental Records, Record Doc. No. 67-11, Patient Record TA-97 dated May 23, 2011; Patient Record OJ-16 dated May 23, 2011.  The other involved a repeated temporary filling over a nine-month period.

40

Id., Patient Record BR-82 dated March 28, 2011.  Dr. Sturm identified three instances of enameloplasty.  Dr. Sturm report, Record Doc. No. 60-12 at p. 8.

According to Dr. Sturm, "[e]ven if patients request the extraction of a tooth that is causing them pain, it is the basic standard of care for the dentist to examine the tooth and provide the patient with an educated understanding of the options available to them and then recommend the procedure that the dentist thinks is best."  Dr. Sturm report, Record Doc. No. 60-12 at p. 6.

Dr. Sutherland declares that about 70 percent of the inmates he has treated at Rayburn choose extraction and about 30 percent choose a filling when given the option.  Dr. Sutherland noted that this is due in part to inmates' poor overall dental health.  Dr. Sutherland declaration, Record Doc. No. 67-11 at ¶ 27.  Dr. Sutherland states that "[t]he standard of dental care both in and out of prisons is to give the patient treatment options and educate the patient on the possible and likely outcomes of each treatment."  Dr. Sutherland "make[s] a recommendation on treatment according to what [he] would do if it were [his] tooth."  Dr. Sutherland declaration, Record Doc. No. 67-11 at ¶ 22.  Drs. Leggio and Bencsek educate their dental patients in the St. Tammany Parish Jail about the options and their recommendations for treatment.  Dr. Leggio deposition, Record Doc. No. 67-9 at pp. 26, 33, 40-41; Dr. Bencsek deposition, Record Doc. No. 67-7 at pp. 28-29, 37.

Dr. Sutherland avers that "[t]here are instances when the only option is to extract a tooth.  When possible, it is always better to save a tooth."  Dr. Sutherland declaration,

41

Record Doc. No. 67-11 at ¶ 22.  Drs. Inglese and Leggio agree with Drs. Sturm and Sutherland that saving teeth is their priority when treating a dental patient.  Dr. Inglese deposition, Record Doc. No. 67-6 at pp. 119-20 (pp. 112-13 of deposition transcript); Dr. Leggio deposition, Record Doc. No. 67-9 at pp. 31, 26, 33, 57, 84.

At the St. Tammany Parish Jail, inmates whose dental condition exceeds on-site capabilities and/or who require oral surgery are sent to an off-site facility, either the LSU hospital system or a local oral surgeon.  Dr. Inglese affidavit, Record Doc. No. 60-9 at ¶ 17; St. Tammany Parish Sheriff's Office Medical Department, list of off-site dental care provided to St. Tammany Parish Jail inmates, Record Doc. No. 60-16; Dr. Inglese deposition, Record Doc. No. 67-6 at p. 153 (p. 145 of deposition transcript).

Drs. Inglese, Bencsek and Leggio and Warden Longino all testified that the St. Tammany Parish Jail has never had an extraction-only policy during the time that they have worked there.  Dr. Leggio deposition, Record Doc. No. 67-9 at pp. 63, 98; Dr. Bencsek deposition, Record Doc. No. 67-7 at p. 68; Longino deposition, Record Doc. No. 67-5 at pp. 83-84; Dr. Inglese affidavit, Record Doc. No. 60-9 at ¶ 15; Dr. Inglese deposition, Record Doc. No. 67-6 at p. 266 (p. 252 of deposition transcript).  Dr. Inglese testified that an extraction-only policy would not meet the standards of care applicable to a jail.  Dr. Inglese deposition, Record Doc. No. 67-6 at p. 121 (pp. 114-15 of deposition transcript).  Dr. Leggio testified that he could not practice dentistry with an extraction-only policy, because then he would have to be an oral surgeon.  Dr. Leggio deposition, Record Doc. No. 67-9 at p. 98.

IV.   ANALYSIS

    A.   No Deliberate Indifference to Serious Dental Needs

Mounce complains that he received constitutionally inadequate dental care for his decaying tooth at St. Tammany Parish Jail.  Specifically, he contends that he should have been offered restorative care, such as a permanent filling, rather than extraction of the tooth.  Plaintiff's evidence fails to establish the elements of this claim and does not create a material fact issue whether defendants are entitled to qualified immunity.

Mounce was a pretrial detainee from February 2, 2011 to August 29, 2011, and was a convicted prisoner after August 29, 2011.  Before the Fifth Circuit's decision in Hare v. City of Corinth, 74 F.3d 633 (5th Cir. 1996), it appeared that prison officials must provide pretrial detainees with reasonable medical care unless the failure to provide it was reasonably related to a legitimate government interest.  Bell v. Wolfish, 441 U.S. 520, 539 (1979); Cupit v. Jones, 835 F.2d 82, 85 (5th Cir. 1987); Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).  The inquiry was "whether the denial of medical care . . . was objectively reasonable in light of the Fourteenth Amendment's guarantee of reasonable medical care and prohibition on punishment of pretrial detainees."  Pfannstiel v. City of Marion, 918 F.2d 1178, 1186 (5th Cir. 1990), abrogated on other grounds as recognized in Martin v. Thomas, 973 F.2d 449, 455 (5th Cir. 1992).

In Hare, however, the Fifth Circuit held:

(1) that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm,

> during their confinement; and (2) that a state jail official's liability for
> episodic acts or omissions cannot attach unless the official had subjective
> knowledge of a substantial risk of serious harm to a pretrial detainee but
> responded with deliberate indifference to that risk.

Hare, 74 F.3d at 650. The Fifth Circuit explained that for the Bell "reasonable

relationship" test to be applicable, the pretrial detainee must be able to show that a prison

official's act either "implement[s] a rule or restriction or otherwise demonstrate[s] the

existence of an identifiable intended condition or practice" or that the "official's acts or

omissions were sufficiently extended or pervasive, or otherwise typical of extended or

pervasive misconduct by other officials, to prove an intended condition or practice." Id.

at 645.  If the pretrial detainee is unable to prove either, the incident will be considered

to be an episodic act or omission, and the deliberate indifference standard enunciated in

Estelle v. Gamble, 429 U.S. 97, 104 (1976), will apply.  Shepherd v. Dallas Cnty., 591

F.3d 445, 452 (5th Cir. 2009) (citing Bell, 441 U.S. at 539; Scott v. Moore, 114 F.3d 51,

53 (5th Cir. 1997); Hare, 74 F.3d at 649); Tamez v. Manthey, 589 F.3d 764, 769-70 (5th

Cir. 2009) (citing Scott, 114 F.3d at 53; Hare, 74 F.3d at 649).

In Estelle, the Supreme Court held that a prisoner may succeed on a claim for

damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that

there has been "deliberate indifference to serious medical needs" by prison officials or

other state actors.  Only deliberate indifference, "an unnecessary and wanton infliction of

pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed

by the Eighth Amendment.  Id. at 105-06; accord Gregg v. Georgia, 428 U.S. 153, 182-83

(1976); <u>Tamez</u>, 589 F.3d at 770; <u>Hare</u>, 74 F.3d at 650.  "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994).  The <u>Farmer</u> definition applies to Eighth Amendment medical claims.  <u>Reeves</u>, 27 F.3d at 176.

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment.  If the court finds that one of the components of the test is not met, it need not address the other component.  <u>Davis</u>, 157 F.3d at 1005.  "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  <u>Farmer</u>, 511 U.S. at 834 (quotation omitted).  Thus, plaintiff must show that defendants "exhibited deliberate indifference to his serious medical [or dental] needs."  <u>Cooper v. Johnson</u>, 353 F. App'x 965, 967 (5th Cir. 2009) (citing <u>Wilson v. Seiter</u>, 501 U.S. 294, 297 (1991)); <u>accord</u> <u>Harris v. Hegmann</u>, 198 F.3d 153, 159 (5th Cir. 1999).

Although the United States Court of Appeals for the Fifth Circuit has not defined "serious medical need," a majority of the other circuits have adopted the following definition.  "A 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  <u>Gutierrez v. Peters</u>, 111 F.3d 1364, 1373 (7th Cir. 1997) (citing <u>Mahan v. Plymouth Cnty.</u>, 64 F.3d 14, 18  (1st Cir. 1995); <u>Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987);

45

Sheldon v. Pezley, 49 F.3d 1312, 1316 (8th Cir. 1995); Riddle v. Mondragon, 83 F.3d

1197, 1202 (10th Cir. 1996); Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176,

1186 (11th Cir. 1994), abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730

(2002)).  A medical condition is "serious" when "the failure to treat a prisoner's condition

could result in further significant injury or the 'unnecessary and wanton infliction of

pain.'"  McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled in part on

other grounds by WMX Tech., Inc. v. Miller, 104 F.3d 1133, 1135 (9th Cir. 1997).

Second, plaintiff must establish that defendant possessed a culpable state of mind.

Farmer, 511 U.S. at 838 (citing Wilson, 501 U.S. at 298).  A prison official cannot be held

liable "unless the official knows of and disregards an excessive risk to inmate health or

safety; the official must both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at

837; accord Tamez, 589 F.3d at 770 (citing Thompson v. Upshur Cnty., 245 F.3d 447,

458-59 (5th Cir. 2001)).

"A showing of deliberate indifference requires the prisoner to submit evidence that

prison officials 'refused to treat him, ignored his complaints, intentionally treated him

incorrectly, or engaged in any similar conduct that would clearly evince a wanton

disregard for any serious medical needs.'"  Gobert v. Caldwell, 463 F.3d 339, 346 (5th

Cir. 2006) (quoting Domino v. Tex. Dep't of Crim. Justice, 239 F.3d 752, 756 (5th Cir.

2001)) (internal quotation omitted) (emphasis added); accord Bohannan v. Doe, 527 F.

App'x 283, 292 (5th Cir. 2013).  "The existence of continuous or regular medical care

generally precludes a finding of deliberate indifference."  Perkins v. Tex. Dep't of Crim.

Justice, 514 F. App'x 488, 489 (5th Cir. 2013) (citing Banuelos v. McFarland, 41 F.3d

232, 235 (5th Cir. 1995)).

> The Supreme Court has recently reaffirmed that "'deliberate indifference'
> is a stringent standard of fault, requiring proof that a municipal actor
> disregarded a known or obvious consequence of his action." . . .  The
> "deliberate indifference" standard permits courts to separate omissions that
> amount to an intentional choice from those that are merely unintentionally
> negligent oversight[s].

Southard v. Tex. Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (quoting Bd. of

Cnty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997) (other quotations omitted)) (emphasis

added); accord Tamez, 589 F.3d at 770.  "'Subjective recklessness,'" as used in the

criminal law, is the appropriate test for deliberate indifference."  Norton v. Dimazana, 122

F.3d 286, 291 (5th Cir. 1997); accord Johnson v. Thaler, 507 F. App'x 370, 371 (5th Cir.

2013); Stockwell v. Kanan, 442 F. App'x 911, 913 (5th Cir.  2011).

For the reasons fully discussed at pages 59-63, I conclude that no prison rule,

restrictions, pervasive or intended condition or practice of jail officials, for purposes of

application of the Bell "reasonable relationship" test, has been established.  Therefore, in

the instant case, the evidence demonstrates that episodic acts or omissions as defined in

Hare are at issue.  See Burton v. Owens, 511 F. App'x 385, 387 n.3 (5th Cir. 2013)

(giving ibuprofen for pretrial detainee's pain over three-day period, instead of Percocet

that was prescribed at hospital, was episodic act or omission); Tamez, 589 F.3d at 770

(defendants' alleged refusal "to provide [prisoner] with immediate medical treatment

qualifies as an 'episodic act or omission'").  Therefore, the "deliberate indifference" standard applies and Mounce must provide evidence sufficient to establish that defendants knew he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it.

"Deprivation of dental treatment may constitute deliberate indifference."  Green v. Hendrick Med. Ctr., 251 F.3d 157, 2001 WL 300844, at *4 (5th Cir. 2001) (citing Harris v. Hegmann, 198 F.3d 153, 159-60 (5th Cir. 1999)).  In this case, the evidence fails to establish facts sufficient to satisfy the stringent "deliberate indifference" standard.

As to the first prong of the deliberate indifference test, plaintiff's evidence fails to establish that his conditions presented serious dental needs that posed a substantial risk of harm during his incarceration in the St. Tammany Parish Jail.  "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."  Gobert, 463 F.3d at 345 n.12 (citing Hill, 40 F.3d at 1187); accord Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).  "In either of these situations, the medical need must be 'one that, if left unattended, pos[es] a substantial risk of serious harm.' . . . .  In certain circumstances, the need for dental care combined with the effects of not receiving it may give rise to a sufficiently serious medical need to show objectively a substantial risk of serious harm." Id. at 1243-44 (quotation and citations omitted) (emphasis added).

Mounce's complaint concerning pain from one tooth that had lost a filling and another tooth that was chipped during a fight does not rise to the level of a serious dental

need for purposes of constitutional analysis.  Although he was diagnosed with advanced decay in tooth number 2, he was offered dental care to treat it and it was not left unattended by jail officials, but by plaintiff himself.  See Hill, 40 F.3d at 1188 (citing Monmouth Cnty. v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (medical need is serious when it "results in an inmate's suffering 'a life-long handicap or permanent loss'")); Dickson v. Colman, 569 F.2d 1310, 1311 (5th Cir. 1978) (no serious medical need was demonstrated when plaintiff's high blood pressure presented no "true danger" or "serious threat" to his health); see also Harrison v. Barkley, 219 F.3d 132, 137 (2d Cir. 2000) ("Ordinarily, a tooth cavity is not a serious medical condition" and treatment "can safely be delayed."); Martin v. Tyson, 845 F.2d 1451, 1457-58 (7th Cir. 1988) (delay in treating broken tooth not sufficiently serious); Lucas v. Cannon, No. 12-0229-SDD-RLB, 2013 WL 4094124, at *5 (M.D. La. Aug. 13, 2013) (cracked enamel crown in need of repair, but not causing pain or inability to eat, is not serious); Mosely v. Highsmith, No. 4:07-CV-1578, 2008 WL 294484, at *2 (E.D. Mo. Jan. 31, 2008) (installing a crown not a serious medical need); O'Connor v. McArdle, No. 04-CV-314, 2006 WL 436091, at *6, *9 (N.D.N.Y. Feb. 22, 2006), aff'd, 217 F. App'x. 81 (2d Cir. 2007) (Inmate's request for a replacement permanent bridge was not a serious medical need when he received ongoing dental treatment, his dentist did not recommend a replacement bridge and plaintiff did not allege any demonstrable physical injury or effect on his activities of daily living.); compare Berry v. Peterman, 604 F.3d 435, 440 (7th Cir. 2010) (Inmate offered "sufficient evidence of an objectively serious medical condition" showing that "he

suffered from tooth decay and serious pain while at the Waushara Jail–his tooth's pulp was 'clearly necrotic,' according to the dental records, requiring an immediate root canal when Berry was finally seen by a dentist shortly after leaving Waushara and returning to a DOC facility.").

Mounce asserts that he suffered "pain in tooth number 2, fluctuating from bearable to intense," trouble sleeping and difficulty chewing solid food because defendants refused to provide him with a permanent filling.  Mounce declaration, Record Doc. No. 67-4 at ¶¶ 18-19.  However, he did not submit any Sick Call Request forms regarding dental care between May 28 and September 30, 2011, indicating that his symptoms were not subjectively serious enough for him to seek additional treatment during that time period. He did not have an abscess or other serious condition requiring surgery.  It is undisputed that the jail did not offer permanent fillings, that plaintiff was given medications and dental wax to manage the pain and that the proffered extraction would have relieved his pain permanently.  Drs. Leggio and Bencsek both opined that, given the level of decay in tooth number 2 when plaintiff was seen on September 12 and October 15, 2011, which was diagnosed by visual examination twice and by x-ray once, extraction was an appropriate treatment.

Although plaintiff told Dr. Bencsek that he did not want the tooth extracted because he thought it would be difficult to chew, since his tooth number 30 had previously been extracted, it was Dr. Bencsek's undisputed opinion that Mounce would still be able to chew after extraction of tooth number 2 because his remaining teeth would be sufficient.

50

Plaintiff has proffered <u>no evidence</u> to contradict these professional opinions.  His refusal to accept appropriate, available treatment that would have cured his symptoms does not make the condition of his number 2 tooth a serious medical need.  <u>See</u> <u>McQueen v. Karr</u>, 54 F. App'x 406, 2002 WL 31688891, at *1 (5th Cir. 2002) (plaintiff's tooth pain "is the result of his own actions" when he chose to decline the offered treatment of extraction because he wanted "more expensive restorative treatment"); <u>Sanders v. United States</u>, 438 F.2d 918, 919 (5th Cir. 1971) ("Petitioner's dental records likewise indicate that his refusal to comply with the recommended treatment procedure is the cause for any discomfort he is presently encountering.  Since petitioner does not wish to undergo extensive dental extractions, the prison authorities are not to be held responsible for the cause of his suffering."); <u>Del Muro v. Fed. Bureau of Prisons</u>, No. 5:03-CV-214-B, 2004 WL 1542216, at *4 (N.D. Tex. July 8, 2004) (citing <u>Swartz v. Steinhauser</u>, 125 F.3d 859, 1997 WL 599547, at *1 (9th Cir. 1997); <u>Sanders</u>, 438 F.2d at 919) ("Plaintiff may not want to have his teeth extracted and he may choose to forgo extractions, but he cannot place blame for any resulting pain upon the Bureau of Prisons.").

As to tooth number 18, which was chipped during a fight on September 30, 2011, Dr. Leggio testified that he did not examine that tooth on October 15, 2011, because Mounce did not complain of any symptoms related to it and because "that was not the main issue on that visit."  Tooth number 2  was the "main issue," the "more pressing" issue, and it caused plaintiff's "primary pain" on that date.  Dr. Sutherland did not consider tooth number 18 a high-risk tooth, unlike tooth number 2, when he later

examined Mounce at Rayburn on June 25, 2012. Tooth number 18 did not present a serious dental need while Mounce was incarcerated at the St. Tammany Parish Jail.

Even assuming, however, that plaintiff's condition presented a serious dental need for constitutional purposes, the undisputed material facts negate any inference that defendants were deliberately indifferent to plaintiff's serious dental needs in the constitutional sense. Mounce was seen by two dentists at three different visits between May 28 and October 15, 2011, in response to the only two Sick Call Request forms that he filed and in response to his first discussion with Dr. Inglese. Drs. Bencsek and Leggio performed visual examinations of plaintiff's mouth twice and took x-rays once. Mounce received an antibiotic and Peridex mouth rinse at his first visit, received prescriptions for pain medication at all three visits and received dental wax twice. Although Mounce sought restorative treatment, he was not offered a permanent filling because the jail does not provide them. Not offering permanent fillings is not deliberately indifferent when other treatment options are available and were actually offered to plaintiff. He was not offered a temporary filling because Drs. Bencsek and Leggio believed a temporary filling would not be effective in his case. Mounce was offered extraction of tooth number 2 because, in the professional judgment of Drs. Bencsek and Leggio, it was the best available option to treat and relieve his symptoms. Dr. Inglese, the medical director, also met with Mounce three times to explain the reasons for his dental treatment. These actions belie plaintiff's allegations of deliberate indifference.

Mounce's evidence fails to establish that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Gobert, 463 F.3d at 346 (quotation omitted).  "Alone, continuing pain does not constitute a constitutional violation when the deficiencies in care are minimal." Stockwell v. Kanan, 442 F. App'x 911, 914 (5th Cir.  2011) (citing Mayweather v. Foti, 958 F.2d 91, 91 (5th Cir. 1992)); see, e.g., James v. Pa. Dep't of Corrs., 230 F. App'x 195, 196-98 (3d Cir. 2007) (Prisoner with abscessed tooth was timely seen twice by dentist, who recommended extraction.  Inmate requested alternative treatment, but jail's policy was not to offer root canals.   "Although James may have preferred a different course of treatment, his preference alone cannot establish deliberate indifference . . . ."); Lucas, 2013 WL 4094124, at *5 (quoting Woodall v. Foti, 648 F.2d 268, 272 (5th Cir. 1981)) (citing McQueen, 54 F. App'x 406) (Inmate who saw prison dentist twice and was advised that his cracked crown was stable, that his pain would subside and that he would not be referred to a private dentist failed to state a claim for deliberate indifference.  "[T]he 'essential test is one of medical necessity and not one simply of desirability.'. . . [P]laintiff was not entitled to the medical treatment of his choice, to the best treatment available, or to all treatment which may have been available to persons who were not incarcerated."); Banks v. York, 515 F. Supp. 2d 89, 103-04 (D.D.C. 2007) (Prison officials' failure to provide inmate with replacement crown was not deliberate indifference when dentist treated prisoner with antibiotics and offered to extract affected teeth.);

O'Connor, 2006 WL 436091, at *10 (Even assuming that plaintiff had a serious medical need, no deliberate indifference existed when he was seen promptly by a dentist, but refused the treatment offered, continued to see the dentist and to receive pain medication, and eventually received an alternative procedure.); Ball v. Johnson Cnty. Jail, No. 3:03-CV-3056-D, 2004 WL 2338105, at *1 (N.D. Tex. Oct. 18, 2004) (no deliberate indifference when inmate alleged that jail nurses examined his tooth; prescribed penicillin, pain reliever, stomach medication and oral gel; regularly refilled these medications; told inmate he could see dentist; but told him that the only treatment the dentist could offer was extraction); Del Muro, 2004 WL 1542216, at *3 (Dentist refused to refill inmate's teeth, from which fillings had fallen out, because dentist believed new fillings would be futile. Dentist recommended extractions based on extent of decay. Inmate contended that jail's policy of offering only fillings and extractions, and not offering bridges or crowns, presented him with untenable options of agreeing to extractions or refusing them and continuing to have pain, in violation of the Eighth Amendment. The court found no deliberate indifference in jail officials denying plaintiff his preferred treatment.).

Dr. Sutherland's later offer once Mounce arrived at Rayburn of either extraction or a permanent filling of his number 2 tooth and Dr. Sutherland's insertion of the filling on July 9, 2012, which was still in place on March 13, 2013, does not establish that Drs. Leggio and Bencsek were deliberately indifferent when, in the exercise of professional judgment, they only offered extraction of that tooth. "[T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment." Gobert, 463

F.3d at 346. Even though Dr. Sutherland's alternative treatment was apparently successful, the evidence does not establish that the dentists at the St. Tammany Parish Jail purposefully neglected plaintiff's dental needs. "[F]ailure to receive the most effective treatment cannot form the basis of deliberate indifference but, rather, sounds in negligence." Id. at 350 n.33 (citing Hasty v. Johnson, 103 F. App'x 816, 820 n.2 (5th Cir. 2004)).

Contentions like Mounce's that amount to a mere disagreement with the speed, quality or extent of medical/dental treatment or even negligence do not give rise to a Section 1983 claim. "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not." Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted); see Rowe v. Norris, 198 Fed. Appx. 579, 2006 WL 2711945, at *2 (8th Cir. 2006) (no constitutional violation when inmate disagreed with physician's choice of medication); Mendoza, 989 F.2d at 193 (prisoner's disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); McQueen, 2002 WL 31688891, at *1 (Plaintiff's allegations "do not establish the denial of medical treatment but . . . reveal only McQueen's dissatisfaction with the treatment offered him, extraction of his injured teeth versus more expensive restorative treatment, which is insufficient to state a claim under § 1983.").

The evidence fails to establish an essential element of plaintiff's claim or to raise a material fact issue that defendants were deliberately indifferent to Mounce's serious

dental needs.  The alleged conduct by defendants did not violate a constitutional right.
Thus, the court's "inquiry [regarding this claim] ceases because there is no constitutional
violation for which the government official would need qualified immunity."  Lytle v.
Bexar Cnty., 560 F.3d 404, 410 (5th Cir. 2009) (citing Saucier v. Katz, 533 U.S. 194, 201
(2001), overruled in part by Pearson v. Callahan, 555 U.S. 223, 236 (2009)); accord
Donley v. Ordeneaux, 419 F. App'x 519, 520 (5th Cir. 2011).  Plaintiff's summary
judgment motion must be denied and defendants are entitled to summary judgment in their
favor on Mounce's claim of inadequate dental care.

> B.   No Extraction-Only Policy

Plaintiff contends that Sheriff Strain, Warden Longino and Dr. Inglese, the
policymakers at the St. Tammany Parish Jail, had an unconstitutional policy of only
offering extractions to inmates with damaged or decayed teeth, and that Drs. Bencsek and
Leggio implemented this policy with regard to plaintiff.  Mounce argues that there is a
clearly established "Eighth Amendment right to basic fillings for decaying teeth" and that
defendants reasonably should have been aware of this right during his incarceration at the
jail.  Plaintiff's memorandum, Record Doc. No. 67-1 at p. 22.

"There is no respondeat superior liability under section 1983."  Eason v. Thaler,
73 F.3d 1322, 1327 (5th Cir. 1996); accord Field v. Corrs. Corp., 364 F. App'x 927, 929
(5th Cir. 2010); Cox v. Irby, 281 F. App'x 390, 391 (5th Cir. 2008); Kohler v. Englade,
470 F.3d 1104, 1114-15 (5th Cir. 2006).  Thus, the policymaker defendants cannot be held
liable under Section 1983 pursuant to a theory of respondeat superior simply because the

persons allegedly responsible for plaintiff's injury, if any, were in their employ or under their supervision.  Sanders v. English, 950 F.2d 1152, 1160 (5th Cir. 1992); Baskin v. Parker, 602 F.2d 1205, 1208 (5th Cir. 1979); Barksdale v. King, 699 F.2d 744, 746 (5th Cir. 1983).

A supervisory official may be held liable for his subordinates' actions only if the official implemented an unconstitutional policy that causally resulted in plaintiff's injury. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-95 (1978); Thompson v. Johnson, 348 F. App'x 919, 921 (5th Cir. 2009) (citing Mouille v. City of Live Oak, 977 F.2d 924, 929 (5th Cir. 1992)); Gates v. Tex. Dep't of Protective & Regulatory Servs., 537 F.3d 404, 435 (5th Cir. 2008).

To prevail on this claim, Mounce

> must show "a policy, custom, or rule (or lack thereof) of the [supervisory officials] that permitted or caused the act or omission."  There must be a "direct causal link" establishing that "an official policy promulgated by the [jail's] policymaker was the moving force behind, or actual cause of, the constitutional injury."

Brown v. Harris Cnty., 409 F. App'x 728, 730  (5th Cir. 2010) (quoting James v. Harris Cnty., 577 F.3d 612, 617 (5th Cir. 2009); Scott v. Moore, 114 F.3d 51, 53 (5th Cir. 1997)).

The undisputed evidence establishes that defendants did not have an extractions-only policy at the St. Tammany Parish Jail during Mounce's incarceration.  Although the jail had a policy of not offering permanent fillings, that is not the same thing as a policy of extractions only.  It is undisputed that defendants offered other procedures to inmates

besides extractions, including enameloplasty, removal of arch bars and orthodontic braces, temporary fillings, x-rays, treatment of periodontal disease, recontouring and smoothing of sharp teeth, equilibration, removal and/or re-cementing of crowns, adjustments of partials and dentures, tooth desensitization, fabrication of dentures and referral to an off-site specialist for emergent problems. Jail dentists also prescribed pain medications and provided dental wax and mouth rinses. Mounce himself had three visits with two dentists who gave him two examinations, one set of x-rays, tooth desensitization, pain medications, an antibiotic and a mouth rinse. He also met three times with Dr. Inglese, who repeatedly explained the treatments. The evidence is undisputed that, although the written policy was revised on July 12, 2012, jail policy itself did not change from what had been in effect while Mounce was at the jail.

As evidence that defendants had an extractions-only policy, Mounce alleges that Dr. Leggio offered on October 15, 2011, to extract his tooth number 18 without examining it. He points out that Dr. Leggio's clinic notes state that Mounce refused "extractions" and the dental refusal form that Dr. Leggio prepared states that he refused extraction of "teeth." Dental Clinic Notes dated October 15, 2011, Record Doc. No. 60-4 at p. 8; Dental Refusal Form dated October 15, 2011, Record Doc. No. 67-12.

However, Dr. Leggio testified that Mounce elected not to have tooth number 2 removed. Dr. Leggio denied in his testimony that he offered to extract tooth number 18. Despite the plural words in the records, Dr. Leggio's contemporaneous notes support his testimony because they state that plaintiff complained that "his primary pain is with the

second molar (#2) w[ith] v. extreme decay."  The notes contain no complaints of pain in the broken tooth, which Dr. Leggio never identifies by number or specific location, stating only that Mounce "claims a lower left tooth broke recently."

Mounce also cites the plural words used in Dr. Inglese's "Physician Note – Note to Chart," dated October 19, 2011, regarding Mounce's report to Dr. Leggio on October 15, 2011, that he did not want tooth number 2 extracted and that another tooth had broken off.  Dr. Inglese stated in his note that Dr. Leggio had explained to plaintiff "that these issue<u>s</u> would require extraction<u>s</u>. However, Mr. Mounce again refused extraction<u>s</u>."  Dr. Inglese wrote that he felt it was possible "that [Mounce] is refusing extraction<u>s</u> in order to procure pain medications on a long-term basis."  Record Doc. No. 60-4 at p. 10 (emphasis added).

Dr. Inglese was not present at plaintiff's visit with Dr. Leggio.  Dr. Inglese's report of his understanding of what transpired at that visit is not probative evidence of what happened.  Dr. Inglese's written opinion that Mounce may have refused "extractions," rather than "an extraction," to procure pain medications is similarly non-probative either of what happened or of the jail's policy.  Indeed, Dr. Inglese's use of the plural "medications," rather than the single word "medication," is not in grammatical agreement with Dr. Inglese's immediately prior assertion that plaintiff was seeking only Ultram and rejecting other medications.  Whether Dr. Inglese, a non-participant in the actual visit, used the plural or the singular in any particular sentence of his Physician's Note regarding that visit is not probative evidence.

Plaintiff also relies on Dr. Sturm's opinions that "the sheer number of extractions and the fact that patients come in saying they want their teeth pulled suggest that the general policy in [St. Tammany Parish Jail] is that the dentists mostly pull teeth" and that "there is an expected and accepted policy of extractions at" the jail. However, I find that those opinions are speculative, unreliable and inadmissible for the reasons stated above with respect to defendants' motion in limine regarding her testimony. The undisputed <u>facts</u> negate the existence of an extractions-only policy.

Mounce testified that Drs. Leggio and Bencsek and a nurse at the jail told him that the dentists there could only extract teeth. Plaintiff's fellow inmate Duffy states the same thing in his declaration. (The unsworn Inmate Complaint Form dated August 3, 2011, Record Doc. No. 67-15, from another inmate, which states that "Dentist told me he only pulled teeth," is inadmissible hearsay. Fed. R. Evid. 801(c). Mounce's and Duffy's declarations that other inmates at the St. Tammany Parish Jail told them that the jail's dentists only offered extractions are also inadmissible hearsay.) Even if the dentists and nurse said this, which the dentists deny, the statements are immaterial in the face of the undisputed evidence that the jail actually provided other procedures and did not, as matter of fact, have an extractions-only policy.

C.    <u>Extractions-Only Policy Not Clearly Established as Unconstitutional</u>

Even if defendants had an extractions-only policy, they would be entitled to qualified immunity on plaintiff's <u>Monell</u> claim because it was not clearly established at the time of Mounce's incarceration that such a policy was unconstitutional. "If . . . the

alleged conduct amounts to a constitutional violation, then we ask the qualified immunity question of whether the right was clearly established at the time of the conduct." Lytle, 560 F.3d at 410 (quotation and citation omitted); accord Donley, 419 F. App'x at 520.

None of the cases cited by plaintiff support his argument that he had a clearly established right to basic fillings or that an extractions-only policy violated his clearly established rights. A District of North Dakota decision recently reviewed the case law on this issue and found that "the cases in which the courts have actually held an 'extraction only' policy to be unconstitutional are few. . . . [There are cases] . . . where the courts have suggested that 'extraction only' policies might violate the Eighth Amendment–in certain circumstances, or have concluded that the issue is an open one." Greywind v. Podrebarac, No. 1:10-CV-006, 2011 WL 4750962, at *6-7 (D.N.D. Sept. 12, 2011), report & recommendation adopted, 2011 WL 4743751 (D.N.D. Oct. 5, 2011), aff'd, 471 F. App'x 544 (8th Cir. 2012) (citing Chance v. Armstrong, 143 F.3d 698, 703-04 (2d Cir. 1998); Mitchell v. Liberty, No. 8-341-B-W, 2009 WL 33435, at *4-5 (D. Me. Jan. 5, 2009), report & recommendation adopted, 2009 WL 294701 (D. Me. Feb. 5, 2009); Heitman v. Gabriel, 524 F. Supp. 622 (W.D. Mo. 1981)).

Mitchell and Heitman are the two opinions cited by Mounce for his argument that the Eighth Amendment right to basic fillings for decaying teeth was clearly established. Aside from the nonbinding nature of these two district court opinions within the Fifth Circuit, both are factually distinguishable from the instant case. In Heitman, the county had a "'policy' of ignoring painful dental conditions, unless the inmate is willing to

submit to the extraction of a tooth at county expense, or has the resources to employ a local dentist for an emergency filling." Heitman, 524 F. Supp. at 627 (emphasis added). Heitman "is an extreme case. There a county jail had refused to provide any dental care short of extraction–not even routine dental fillings when that would suffice to alleviate an inmates' [sic] pain." Greywind, 2011 WL 4750962, at *6. That is not the policy at the St. Tammany Parish Jail, where other measures besides extraction are routinely offered to alleviate pain and when defendants did not ignore plaintiff's complaints about his teeth.

Mitchell was decided on a motion to dismiss, rather than a motion for summary judgment, so that plaintiff's allegations, unsupported by any evidence, were accepted as true for purposes of the motion. Mitchell alleged that he had

> complained to the medical department that three teeth were causing him considerable pain; that he had an ongoing complaint for over 18 months; that he was told that the jail did not have a dentist; that one of his teeth had a piece broken off exposing a painful nerve; that when he filed a second level grievance, in less than two weeks he was sent to an outside dentist who extracted an infected tooth; and that approximately two months later he was back at the dentist for the other two teeth, both of which were also pulled because the jail's policy does not permit fillings.
> . . . .
> . . . . He concedes that he received emergency dental treatment when his tooth became infected and had to be extracted, but indicates that the county has a policy of not performing corrective or preventive dental work including routine recommended dental fillings.
> . . . .
> When Mitchell's pleadings are reviewed in their entirety it appears that his allegation is that Kennebec County refuses to provide dental care other than emergency extractions. . . . If Mitchell's pleadings are viewed through this lens he has at least alleged a possible constitutional violation caused by a county[-]wide policy.

62

Mitchell, 2009 WL 33435, at *2, *3, *4 (emphasis added).  The alleged deprivations in

Mitchell were more extreme than the facts established by the undisputed evidence in the

instant case.  Further, the Mitchell court neither held that a constitutional violation existed

nor that an inmate had a clearly established right not to be subjected to an extractions-only

policy.

"On the other hand, a number of courts have held that prison policies that offer

extraction in lieu of such things as crowns, implants, and even root canals in certain

situations do not violate the Eighth Amendment."  Greywind, 2011 WL 4750962, at *7

(citing James v. Pa. Dep't of Corrs., 230 F. App'x 195, 197-98 (3d Cir. 2007); Brathwaite

v. Corr. Med. Servs., 630 F. Supp. 2d 413 (D. Del. 2009); Koon v. Udah, No. 8:06-2000,

2008 WL 724041, at *7 (D.S.C. Mar. 17, 2008); Wilkens v. Ward, No. Civ-05-254-M,

2007 WL 2407082, at *6-7 (W.D. Okla. Aug. 22, 2007); Del Muro, 2004 WL 1542216,

at *3-4; Kopera v. Cook Cnty. Bd., 1994 WL 577238, No. 93-C-3934, at *5 (N.D. Ill. Oct.

18, 1994)).

"Also, there are courts that have held that extraction in lieu of restorative work did

not violate the Eighth Amendment, but it is not clear from the facts of those cases whether

the offer of extraction was based upon a determination that it was an appropriate treatment

under the prisoner's particular circumstances or a blanket prison policy."  Id. at *8 (citing

McQueen, 2002 WL 31688891, at *1; Campbell v. St. Clair Cnty. Jail, 2:08-cv-10224,

2008 WL 186376, at *2 (E.D. Mich. Jan. 22, 2008)).

My own research confirms the North Dakota court's conclusion that "it is apparent that there is no 'clearly established' right on the part of prisoners to dental treatment in the form of crowns and implants in lieu of extraction, particularly when the latter appropriately resolves the underlying problem and does not unduly compromise the prisoner's health." Id.  Mounce has cited no authority, and my research has located none, to support his contention that he had a clearly established right to a permanent filling when the jail offered him alternative, effective, professionally appropriate and readily available treatment options.

In the absence of a clearly established right to a dental policy that is not limited to extractions only, Mounce has failed to carry his burden to rebut defendants' assertion of qualified immunity.  Accordingly, plaintiff's motion for summary judgment must be denied and defendants are entitled to summary judgment in their favor as a matter of law.

D.    State Law Claims Dismissed Without Prejudice

Mounce asserts state law claims that defendants' actions with respect to the dental care he received at the St. Tammany Parish Jail "constitute negligent physical injury and emotional distress pursuant to La. C.C. Art. 2315."  Amended Complaint, Record Doc. No. 28 at ¶ 94.  Defendants argue that these claims should be dismissed either because Mounce has not brought his claim of dental malpractice before a medical review panel before filing suit, as required by La. Rev. Stat. § 40:1299.41 et seq., or because this court lacks jurisdiction over his state law claims once it has dismissed his federal claims.

64

This court declines to exercise supplemental jurisdiction over Mounce's state law claims under the circumstances presented in this case.  "[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  The court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  Id. § 1367(c)(3).  The court's determination whether to exercise supplemental jurisdiction is guided by "both the statutory provisions of 28 U.S.C. § 1367(c) and the balance of the relevant factors of judicial economy, convenience, fairness, and comity that the Supreme Court outlined in Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350-51 (1988), and United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)."  Batiste v. Island Records, Inc., 179 F.3d 217, 227 (5th Cir. 1999); accord Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc., 554 F.3d 595, 602 (5th Cir. 2009).

> The statutory considerations are whether
>
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  Although the Fifth Circuit's

> "general rule" is to decline to exercise jurisdiction over pendent state law claims when all federal claims are dismissed or otherwise eliminated from a case prior to trial, this rule is neither mandatory nor absolute.  Thus, while

the district court's dismissal of the [plaintiff's] federal claims provides a powerful reason to choose not to continue to exercise jurisdiction, no single factor is dispositive in this analysis.

Batiste, 179 F.3d at 227 (quotations and citations omitted); accord Brookshire Bros., 554 F.3d at 602.   The district court must make its decision "in light of the specific circumstances of the case at bar," id. (citation omitted), and must "balance each of the statutory factors in order to determine whether" to retain jurisdiction.   Enochs v. Lampasas Cnty., 641 F.3d 155, 159 (5th Cir. 2011).   The Fifth Circuit's

> case law is clear that when a district court declines to exercise jurisdiction over remaining state law claims following the dismissal of all federal-law claims and remands a suit after investing a significant amount of judicial resources in the litigation analogous to that invested by the district court in this case [during more than 3 years of litigation, the court had decided 41 dispositive motions, 14 Daubert motions and 7 other motions in limine; discovery was closed; and the parties were making final preparations for their fourth trial setting], that court has abused its discretion under 28 U.S.C. § 1367.

Brookshire Bros., 554 F.3d at 602.

In the instant case, plaintiff's federal claims have been dismissed.   The factors of judicial economy, convenience, fairness and comity weigh in favor of declining supplemental jurisdiction over his state law claims.   First, no federal claims remain in the case.   Second, comity favors dismissing the state law claims and letting the state court handle them because of Louisiana's interest in adjudicating the claims of its citizens brought under its laws.   Third, although Drs. Inglese, Leggio and Bencsek have neither asserted specifically nor provided any evidence that they are qualified health care providers entitled to the protections of the Louisiana Medical Malpractice Act, La. Rev.

Stat. § 40:1299.41 et seq., they have raised the definite possibility that plaintiff's negligence claims against them might be subject to the provisions of that Act, which would require him to invoke a medical review panel before filing suit on the claims. By its special legislation concerning such claims, Louisiana has expressed a strong comity interest in adjudicating them through its own system. Finally, fairness and convenience are equal whether the claims are brought in state or federal court.

"Unadjudicated pendant [sic] state law claims must be dismissed without prejudice to allow the plaintiff to refile in state court when a district court dismisses the federal claims serving as the basis for its jurisdiction and elects not to exercise supplemental jurisdiction over the state law claims." Brown v. Miss. Valley State Univ., 311 F.3d 328, 334 n.6 (5th Cir. 2002) (citing Bass v. Parkwood Hosp., 180 F.3d 234, 246 (5th Cir. 1999)); accord Johnson v. Tex. Bd. of Crim. Justice, No. 07-20396, 2008 WL 5069357, at *2 (5th Cir. Dec. 2, 2008). Accordingly, plaintiff's claims under La. Civ. Code article 2315 are dismissed without prejudice.

<u>CONCLUSION</u>

For all of the foregoing reasons, **IT IS ORDERED** that defendants' motion for summary judgment is GRANTED, plaintiff's motion for summary judgment is DENIED and plaintiff's Section 1983 claims are DISMISSED WITH PREJUDICE. IT IS FURTHER ORDERED that plaintiff's state law claims are DISMISSED WITHOUT

PREJUDICE.  Judgment will be entered accordingly.  Under the circumstances presented in this case, all parties must bear their own costs.  Fed. R. Civ. P. 54(d)(1).

New Orleans, Louisiana, this __10th__ day of June, 2014.


JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE